Verna Mae **EYLER** and Wallace **Eyler**, Plaintiffs-Appellants,

v.

Robert **ALLISON**, Defendant-Respondent.

No. 34789.

Missouri Court of Appeals, St. Louis District, Division Two.

Sept. 18, 1973.

Zenge & Smith, Canton, for plaintiffs-appellants.

Carstarphen, Harvey & Wasinger, Hannibal, for defendant-respondent.

KELLY, Judge.

This is an appeal from a judgment of the Circuit Court of Clark County; it presents a single issue for review, i.e., did the trial court err by sustaining respondent's motion for a directed verdict at the close of the appellant's evidence. We have concluded that there was no error in the trial court's ruling and the judgment entered thereon.

The granting of a directed verdict at the close of plaintiff's evidence is a drastic action and one which should be taken only when all the evidence and the reasonable inferences therefrom are so strongly against the plaintiff that reasonable men could not differ. McCarthy v. Wulff, 452 S.W.2d 164, 168 [3] (Mo. 1970). If a party having the burden of proof has adduced substantial evidence on a pleaded issue, the issue should be submitted to the jury; and where substantial evidence is present it is reversible error to direct a verdict. Reeves v. Smith, 468 S.W.2d 713, 715 [1–2] (Mo.App. 1971). In deciding the contention of the appellants that they adduced substantial evidence for the submission of their claim to the jury, we must view the evidence before the trial judge in a light most favorable to the appellants and indulge in all reasonable inferences from the evidence in their favor. Except when unreasonable or opposed to physical laws, appellant's evidence must be taken as true. Brubaker v. Moore, 432 S. W.2d 216, 217 [1] (Mo. 1968). However, we must find substantial evidence supporting appellants' claim; a mere scintilla of evidence is not sufficient. Clymer v. Tennison, 384 S.W.2d 829, 834 [3] (Mo. 1964).

Appellants, husband and wife, brought this negligence action in two counts. Count I, the wife's claim, sought damages for personal injuries and loss of wages allegedly sustained when respondent,

driving a truck westwardly over and along Highway 16 over a bridge which spanned the Wyaconda River two miles west of the City of Canton, Missouri, struck her and knocked her into the river bed. The negligence of respondent, as alleged by Mrs. Eyler, was that respondent:

1) failed to keep a lookout for persons on the bridge,

2) failed to see her on the bridge,

3) drove and operated his truck into and against her, and

4) failed to turn to the left to pass her.

Count II, her husband's claim, alleged the same grounds of negligence on respondent's part and sought damages for expenses incurred for the medical, hospital, doctor and nursing care incurred as a direct result of the injuries sustained by his wife and also for loss of consortium and companionship.

Respondent's Answer denied the allegations of both Counts of appellants' petition and further set out the affirmative defenses of contributory negligence and assumption of risk.

The appellants' evidence viewed most favorably from their viewpoint and affording them the benefit of all reasonable inferences was as follows.

Mr. and Mrs. Eyler were husband and wife since sometime in 1960. On December 14, 1966, and for some eight and one-half years prior thereto, Mrs. Eyler had been employed as a driver of a Star route mail truck between Canton, Missouri, and Monticello, Missouri. As additional employment she had also contracted with the United States Corps of Engineers to take daily readings of a water gauge on the Wyaconda River and to make bi-weekly reports of her recordings. The water gauge she was hired to read was situated on a bridge over the Wyaconda River approximately two miles west of Canton, Missouri, attached to the highest steel structure of the bridge, and locked with a padlock. To take the reading she would have to go onto the bridge to the location of the box containing the measuring device—a chain with a weight on the end—lower the chain until the weighted end of the chain touched the surface of the river, and then make the notation as to its height from the gauge. The bridge carries Highway 16 over the river and is situated on an "S" curve. One traveling westwardly on Highway 16 and approaching the bridge would traverse a curve to the left, cross the bridge and then make the curve to the right. The bridge is a narrow bridge, approximately 18 feet in width, and Mrs. Eyler knew that it was dangerous. She drove this route daily and her best estimate was that one driving westwardly on the highway could see the bridge and the area where the gauge was located from a distance of 1200 feet to the east. The highway for that distance was level.

On December 14, 1966, at about 3:30 p. m. Mrs. Eyler was driving her mail truck westwardly on Highway 16 and after she crossed the bridge over the Wyaconda River she pulled off onto the shoulder of the highway and parked her mail truck off the highway but parallel thereto. She got out of the mail truck and walked back onto the bridge to the water gauge box to take the water level reading of the River. After reaching the area of the gauge, she was standing on the highway surface immediately adjacent to the steel railing on the side of the bridge. She was standing erect, since it was not necessary for her to stoop over to measure the water level by use of the gauge, and had her back to any traffic which would be crossing the bridge. At the time she was wearing a bright blue jacket and blue denim slacks. While attempting to take the reading she heard a vehicle approaching from the east. She looked and saw that it was a big red truck with a "grain bed" on it. She stepped up onto a 6 or 7 inch curb at the side of the bridge. At that time she also heard another vehicle coming from the west and when she turned and looked in that direction she observed that it was a car. She remem-

bered that the truck came onto the bridge and the next thing she recalls she was lying on her back helpless in the icy water below the bridge. She remained there for about one and a half hours until her plight was discovered by a passerby who was attracted by her cries for help. An ambulance was called and conveyed her to a hospital in Quincy, Illinois.

Because of the result we have reached a recitation of the injuries sustained by Mrs. Eyler would serve no purpose and for that reason we omit any references to said injuries.

Trooper Joe Wilson, a patrolman with the Missouri State Highway Patrol, testified that he was called to the scene of the occurrence on the 14th day of December, 1966, and during the course of his investigation of the incident he went to the hospital in Quincy, Illinois, and requested that any clothing which was worn by Mrs. Eyler and which might have paint on it be saved for him. A couple of days later he went to the Eyler house and obtained the clothing Mrs. Eyler was wearing at the time she was injured from Mrs. Eyler's daughter. In the meantime he learned that the respondent had gone to the home of Pearl Hicks, Sheriff of Lewis County, Missouri, on the 15th day of December, 1966, and advised the Sheriff that he, Mr. Allison, had heard on the news that a lady had been hurt on the bridge; that he had a truck that was red and had crossed the bridge about that time of day. With this information at hand, Trooper Wilson went to the respondent's home where he saw an "older model truck" with a red cab and a "homemade" bed on it. He talked with the respondent and advised him of the information he already had; respondent stated to him that he, the respondent, had crossed the bridge that day and about that time, but that he did not remember seeing anybody on the bridge or hitting anyone. Trooper Wilson, with the consent of the respondent, took samples of some paint from the part of the truck just behind the cab, on the right hand side, put it in an en-

velope, and made a notation on the envelope of the source of the paint sample. He kept the envelope and its contents in his possession until he delivered it and Mrs. Eyler's clothing to Sergeant Burnett, the Troop's evidence technician, in the same condition they were when he received them.

On cross examination, Trooper Wilson testified that when he examined respondent's truck it had no damage on it. That it had two colors of paint; the edge of the bed of the truck was painted white, and the wooden part—the slats—of the bed was painted red and the cab was painted red. He did not remember seeing any gray nor black paint on the truck anywhere. He further testified that the widest part of respondent's truck was 8 feet; that one-half of the highway where it crossed the bridge was 9 feet wide.

Sergeant Richard P. Burnett, an evidence technician for the Missouri State Highway Patrol, testified that he received three envelopes of paint samples and some clothing from Trooper Wilson on January 5, 1967, at Macon, Missouri, and he took them to the patrol laboratory in Jefferson City, Missouri, on January 11, 1967, where he delivered them to Frank Durham. In the interim he kept them in a locked evidence room and that their condition was unchanged.

On cross examination Sergeant Burnett acknowledged that the morning of the trial he had exhibited to respondent's counsel the "Record Evidence Locker" book showing that when he received the clothing and the paint samples on January 5, 1967, the evidentiary articles were marked as follows:

"A. blue and black jacket.

B. paint specimen from a bridge.

C. paint specimen from Mr. Allison's truck.

D. paint specimen from Mr. Allison's truck."

This portion of the book, p. 114, was unmarked but it was stated into the record

that it would be photostated and produced on appeal. The document is before this Court.

Frank Durham, a chemist with the Missouri State Highway Patrol was the next witness offered by the appellants. He testified that on January 11, 1967, he received some material for chemical analysis from Sergeant Burnett. This material consisted of a bundle of clothing and three envelopes containing paint samples. Examination of the clothing by means of a stereo-microscope revealed some paint and grease smears. The right shoulder, right sleeve and right side of the "blue and black coat" were torn, and there was a paint smear on the right sleeve area, at about the right hip area. The paint, "noting it with the naked eye was reddish, with a light gray or white present." He also found two paint chips on the coat and made a direct comparison of these, layer arrangement and thickness side-by-side, with the paint samples he had received from Sergeant Burnett. He also tested these samples with acetone and sodium hydroxide, and from both of these tests—the chemical as well as the microscopic—he concluded that *the paint from one of the envelopes,* the one coming from the truck bed, and the paint chips found on the coat "have a common origin" and, in his opinion, the two chips of paint found on the coat did come from the bed of the truck.

On cross examination Mr. Durham acknowledged that when he received the evidentiary items they were marked alphabetically, i. e., the coat was marked "A" and the envelopes containing the paint samples were marked "B, C and D." According to his testimony the paint samples from respondent's truck were marked "B" and "C". "D" was identified as coming from the bridge. He conceded that there was some "mix-up" in the marking of the envelopes and that if respondent's truck, which he had never seen, had neither black nor gray paint on it, the sample upon which he formed his opinion could not have come from respondent's truck.

Appellants had the burden of proving that respondent struck Mrs. Eyler while she was standing on the bridge over the Wyaconda River. There was no direct evidence that it did. The only circumstantial evidence is that Mr. Allison reported to the Sheriff that he was in the area crossing the bridge "at about that time." He stated to the Sheriff that he saw no one on the bridge at the time he drove across it and that he had no knowledge of hitting anyone. The evidence offered by the appellants relative to the scientific paint tests is of no avail because from their evidence the jury could not be permitted to speculate that the red paint on the jacket or coat worn by Mrs. Eyler at the time of the occurrence came from respondent's truck. The expert testimony was without probative value in this respect, because it merely tended to show that Mrs. Eyler had come into contact with the bridge, which was described by witnesses as painted metallic gray. Mr. Durham's testimony was that the chips of paint from Mrs. Eyler's jacket and the sample he compared them with, consisted of six layers of paint in this order: black, thin red, thin white, thin red, thicker red and metallic gray. He could not say which was the exterior layer, but it had to be either black or metallic gray. The chemical analysis did not aid appellants, because it merely corroborated the microscopic tests that the sample from the bridge was from the same "common source" as that contained in the sample envelope.

There is no evidence that the paint smear found on Mrs. Eyler's jacket could have been or was compared with the samples from respondent's truck and the bridge. The only evidence with respect to this paint is that, to the naked eye it was reddish with a light gray or white present. There was no chemical or microscopic examination made so far as we can deduce from the transcript of the record. The evidence, the testimony is, has been destroyed, so we will never know what scientific tests with respect to the paint smear on the jacket of Mrs. Eyler would reveal.

We conclude that the trial court did not err in sustaining respondent's motion for directed verdict at the conclusion of the appellants' evidence and therefore affirm.

SMITH, P. J., and SIMEONE, J., concur.