Harold V. KAELIN and Lorna Kaelin Plaintiffs-Appellants,

v.

Frank NUELLE d/b/a W. F. Nuelle & Sons, Defendant-Respondent,

and

Mabel Cathey, Defendant-Appellant.

Nos. 36001, 36002.

Missouri Court of Appeals, St. Louis District, Division Two.

May 11, 1976.

Goldenhersh & Newman, St. Louis, for Harold V. Kaelin and Lorna Kaelin.

Evans & Dixon, Eugene K. Buckley, St. Louis, for Mabel Cathey.

Hiram W. Watkins, Clayton, for defendant-respondent.

KELLY, Judge.

These are consolidated appeals in which the plaintiffs in the trial court, Harold and Lorna Kaelin, sought damages for personal

injuries sustained by Mr. Kaelin as a result of the alleged negligence of defendants Frank K. Nuelle and Mabel Cathey. At the conclusion of all of the evidence the trial court sustained the motion of defendant Frank Nuelle for a directed verdict and submitted the case to the jury against Mrs. Cathey on failure to keep a careful outlook *or* on failure to swerve. The jury after deliberations returned a verdict for Mr. Kaelin on Count I of his petition awarding him damages of $47,500.00 but found in favor of the defendant on Mrs. Kaelin's claim for loss of consortium under Count II of the petition. Mr. Kaelin filed a Motion for New Trial as to the trial court's ruling on defendant's Nuelle's directed verdict. Mrs. Kaelin filed her Motion for New Trial as to the trial court's ruling on defendant Nuelle's directed verdict and a Motion to Set Aside the jury verdict in favor of Mrs. Cathey on Count II of the petition and for judgment in her favor against Mrs. Cathey or, in the alternative for a new trial on the issue of damages only, or as another alternative, for a new trial against both defendants. Defendant Cathey also filed her Motion for Judgment in accordance with her motion for a directed verdict, or, in the alternative, for a new trial on Count I of plaintiffs' petition, or, in the alternative, for reduction of judgment. In due time these motions were argued and denied. These appeals followed.

Because of the points presented on review in this court and the necessity to state the facts in the case in light of the issues, it is sufficient at this stage of this opinion to state that the occurrence in evidence took place at approximately 2:00 a. m. on June 19, 1970, on Highway I–55 in the City of St. Louis in the vicinity of the Poplar Street Bridge exit on a portion of the Highway just north of where the highway commences to dip down to go under a railroad overpass and the Poplar Street Bridge. There were two separate collisions; the first between a pick-up truck, the property of Mr. Nuelle, and the Kaelin automobile, a 1963 Dodge fourdoor, and the second, a few minutes later, between Mrs. Cathey's 1969 Pontiac Convertible and the Kaelin motor vehi-

cle. The evidence is that Mr. Kaelin sustained serious bodily injuries and his motor vehicle was extensively damaged. The damages as such are not in issue on this appeal.

Because of the nature of the points presented for review we shall hereinafter state the facts more in detail as we consider each appeal separately.

I.

## THE KAELIN APPEAL ON THE DIRECTED VERDICT FOR NUELLE

The issue presented in this appeal is whether the plaintiffs pleaded and proved that defendant Nuelle was guilty of negligence because he either knew or should have known that there was a likelihood that his pick-up truck would be stolen, but he nevertheless negligently failed to secure the vehicle and its keys from theft, and that such conduct was the proximate cause of the collision which caused the Kaelins' injuries and damages. As plaintiffs state in the argument portion of their brief, "the issue on this point is pure and simple 'forseeability.'" We affirm.

The granting of a directed verdict at the close of the plaintiffs' evidence is a drastic action which should be taken only when all the evidence and reasonable inferences therefrom are so strongly against the plaintiff that reasonable men could not differ. When the party having the burden of proof has adduced substantive evidence on a pleaded issue, that issue should be submitted to the jury and it is reversible error to direct a verdict against that party. In deciding whether the plaintiffs in this case adduced substantial evidence which would require that their theory of Mr. Nuelle's negligence be submitted to the jury, it is our duty to view the evidence before the trial judge who directed the verdict against the plaintiffs in a light most favorable to the plaintiffs and indulge in all *reasonable* inferences from the evidence in their favor. Except when unreasonable or opposed to physical laws, plaintiffs' evidence must be

taken as true. However, we must find substantial evidence supporting plaintiffs' claim; a mere scintilla of evidence is not sufficient. *Eyler v. Allison*, 500 S.W.2d 49, 50[1–6] (Mo.App.1973).

■ Viewed in light of the foregoing principles, the evidence adduced by plaintiffs at trial was that Frank Nuelle was the owner of the pick-up truck with which Mr. Kaelin collided head-on. Mr. Nuelle operated a service station at 3808 Enright Avenue, which actually faced on Spring Avenue, a north-south street. The office portion of the service station was situated on the north side of the service station building and within the office there was, in addition to a desk, a cash register and "things of that sort." The door to the office had three locks; two on the door itself and one on an iron grating over the door. Immediately to the south of the office were two garage stalls; these stalls had no doors on them. To the south of these stalls were two more garage stalls, but these had doors on them which could be locked, and the keys to these doors were kept in Mr. Nuelle's pockets.

Mr. Nuelle had operated this service station for forty-three years, and since 1930 had customarily parked a pick-up truck in the unlocked garage stall closest to the office in such a manner as to prevent anyone from obtaining entry into a supply room situated next to the office in the service station. Five years prior to this occurrence, Mr. Nuelle began experiencing thefts at the service station, and during that period his business was burglarized eight or nine times. His pick-up truck had been "stolen" twice prior to June 18, 1970, and on one occasion the truck was found at the corner of the alley but its motor had not been started. On the other occasion he found the truck in the vicinity of Sarah and Washington, 3 or 4 blocks from his place of business. In 1967 someone had attempted to steal a customer's car from one of the

locked garage stalls by crashing the car through the door of the stall.

At about 8:00 p. m. the evening of June 18, 1970, Mr. Nuelle parked the pick-up truck in its customary position in the garage stall closest to the service station building, turned off the ignition, removed the keys and locked both doors and the window vents. He left the premises and did not return until the following morning when he discovered that the pick-up truck was gone from where he had left it. He called the Ninth District police station and reported that the truck had been stolen.

Sometime after Mr. Nuelle left the premises on the night of June 18, 1970, someone stole his pick-up truck and at approximately 2:00 a. m. on June 19, 1970, while operating the truck in a southerly direction over and along the northbound inside lane of Highway I–55 without any headlights and at a high rate of speed, collided head-on with the Kaelin automobile which was then being operated by Mr. Kaelin northbound on the same highway.

Following the collision witnesses testified that they observed the driver of the pick-up run from the truck, cross the highway and flee the scene.

Later the same morning both vehicles were towed from the scene of the collision to the premises of the Metropolitan Towing Service where two of Mr. Kaelin's brothers testified they saw the Nuelle pick-up truck that same day and each said that when they viewed the truck there were ignition keys in the ignition of the truck and denied seeing any jumper under the hood or under the dashboard of the truck.[1]

There is no issue presented on this appeal with respect to the injuries and medical expenses sustained by Mr. Kaelin nor the property damage to the Kaelin vehicle.

Briefly stated, plaintiffs' argument is that defendant Nuelle either knew or should have known, in the exercise of ordinary care, that by leaving the pick-up truck

---

1. Defendant Nuelle's evidence with respect to the keys in the ignition and the manner in which the truck was started are in conflict with plaintiffs' evidence, but because of the posture in which this point is presented we disregard Nuelle's evidence on this point.

in an unlocked garage stall, and by reason of his past experience that 1) his place of business had, on 8 or 9 occasions, been burglarized, 2) this same truck had been removed from this same open garage stall on two prior occasions, 3) an attempt had been made on one occasion to steal a customer's car from one of the locked garage stalls, and 4) he nevertheless left the keys to the truck in the ignition knowing that someone might steal his truck and operate it in a negligent manner so as to injure someone, and more particularly, Mr. Kaelin.

We have examined the authorities cited by both parties on this appeal and for those who are interested with the numerous decisions where the question of the liability of a motorist who left the key to his motor vehicle in the ignition of the motor vehicle for damage or injury caused by a stranger operating the motor vehicle are treated, we would refer them to an extensive annotation in 45 A.L.R.3rd 787. We will not, however, unduly lengthen this opinion by extensive citation therefrom.

Plaintiffs cite *Gower v. Lamb*, 282 S.W.2d 867 (Mo.App.1955), and *Zuber v. Clarkson Construction Co.*, 363 Mo. 352, 251 S.W.2d 52 (1952), as authority that under their evidence they should have been permitted to submit their theory of defendant Nuelle's negligence to the jury. Defendant Nuelle relies on *Gower*, supra, for its contention that plaintiffs did not make a submissible case, and points out that the court in *Zuber* held that absent actual knowledge of the practice of third parties using the vehicle—in *Zuber*, an earth moving tractor—the defendant-owner was not responsible to injured parties by reason of the unauthorized operation of the vehicles which were left unattended in a public place in such condition that the machines could be started and operated by curious and intermeddling members of the public. We agree with defendant Nuelle's analysis of these two cases.

*Gower* held that a motorist leaving his automobile on a public thoroughfare in an urban area with the keys in the ignition, but with the motor turned off, and who left

the car unattended while he stepped into a nearby alley and relieved himself, was not liable for damages to plaintiffs' parked car which was collided with by defendant's motor vehicle being operated by a thief who stole defendant's car in the interim. See also Restatement of Torts, Second, § 302B, Illustration No. 2, pp. 89–90.

We hold that here, where the only evidence is that defendant Nuelle parked his pick-up truck in a garage stall, on private property, locked the doors of the truck and left it there with a key in the ignition, the plaintiff, as a matter of law, failed to adduce sufficient evidence of negligence or proximate causation to make a submissible case even though there was some evidence that defendant Nuelle's place of business had, over a period of 5 years, experienced some eight or nine burglaries and this same pick-up truck had been removed from the premises for a short distance on two prior occasions. The trial court committed no error in directing a verdict for Mr. Nuelle and we rule this point against plaintiffs.

## II.

### THE CATHEY APPEAL

Defendant Mabel Cathey's first point in this appeal is that the trial court erred in failing to sustain her motion for directed verdict at the close of all of the evidence for the reason that the plaintiffs failed to make a submissible case of negligence on the disjunctive theories of failure to keep a careful lookout or failure to swerve upon the reasonable likelihood of collision. She further contends that by reason of this infirmity in plaintiff's case she is entitled to a new trial. Her second point is that because Mr. Kaelin failed to make a submissible case on one of the disjunctive theories upon which he submitted his case to the jury, she is entitled to a new trial. Her third point is that the trial court erred in denying her trial counsel the right to comment, in closing argument, on the failure of Mr. Kaelin to meet his burden of proof that Mrs. Cathey had the ability to avoid the collision after she could have seen the Kaelin automobile. Her final

point is that the trial court erred in striking from her Answer an allegation that Mr. Kaelin had received payment for sums he was legally entitled to recover as damages from the operator of the pick-up truck, that this sum should be deducted from the total damages awarded, and in rejecting evidence to this effect.

■ Mrs. Cathey's first two points depend on whether a submissible case was made against her on the theories of negligence submitted to the jury. In determining whether a submissible case was made for the jury and whether the trial court erred in not sustaining a defendant's motion for directed verdict at the close of all of the evidence, the plaintiff must be given the benefit of any and all reasonable inferences to be drawn from the evidence which is not in conflict with plaintiff's theory of the case and defendant's evidence must be disregarded unless it aids plaintiff's case. *Wardenburg v. White*, 518 S.W.2d 152, 154[1] (Mo.App.1974).

Viewed in this light, the evidence most favorable to plaintiff herein is that some short time after the Nuelle pick-up truck had collided head-on with the Kaelin motor vehicle, and while both of these vehicles were still on the highway, a second northbound automobile driven by defendant Cathey collided with the Kaelin automobile causing Mr. Kaelin to be thrown out of his car and onto the highway.

Highway I–55, at the collision scene, is a six lane divided interstate highway, separated by a center rail so that there are three northbound and three southbound traffic lanes, each lane described as between 12 to 15 feet in width. There is also an exit ramp, 8 to 10 feet in width, located next to the easternmost northbound traffic lane for access to the Poplar Street Bridge. The lighting conditions at this location are good. One of the witnesses—Mrs. Clancy—testified that she could observe Mr. Kaelin slumped over the wheel of his car following the first collision from a distance of 150 feet, looking north to south. The surface of the highway was dry. As one proceeded northwardly over and along the northbound

traffic lanes of I–55 the highway is elevated but as it approaches the Poplar Street Bridge it dips downgrade so the motorists driving thereon can pass under a railroad overpass and the Poplar Street Bridge; the degree of grade of this dip is not specified in the evidence.

The first collision between the Nuelle pick-up truck and Mr. Kaelin's 1963 Dodge occurred on that portion of the Highway which is downgrade, but just where is subject to conflicting evidence. There were four persons on the scene at that time: Mr. Kaelin, Mr. and Mrs. Clancy, and the driver of the pick-up truck. The latter departed almost immediately after the collision. Mr. Kaelin could shed no light on where the first collision occurred with respect to what was referred to by counsel as "the crest of the hill," i. e. where the highway commences its downward grade. Mr. Clancy estimated that the Kaelin automobile came to a stop 80 or 90 feet north of the "crest of the hill," after the initial collision. Mrs. Clancy estimated that when she saw the Cathey car as it was coming over "the crest of the hill" the Kaelin auto was "5 car lengths" or "100 feet" north of the crest of the hill. The Nuelle pick-up truck came to a stop in the median lane, that closest to the divider, facing southwardly, and up against the divider. The Kaelin car was sitting facing somewhat northeast, partly in the median lane and partly in the center lane for northbound traffic. Again the evidence does not establish exactly how much of the Kaelin car was in the middle traffic lane. There is conflicting evidence on whether the Nuelle pick-up truck came to a stop some distance south of the Kaelin vehicle following the initial collision. Mrs. Clancy testified that the pick-up truck did not go past the Kaelin car—but that both cars came to a stop. According to Mr. Clancy, however, after the first collision the pick-up truck proceeded some distance south of the Kaelin car before it came to a stop.

With this scene thus set, Mrs. Cathey was proceeding northwardly in the middle northbound traffic lane of Highway I–55 at a speed of between 45 and 50 m. p. h. in her

1969 Pontiac convertible which was equipped with power steering and power brakes in good working order. The tires on her car were in good condition. She was driving with her "city beam" headlights on. There was no other traffic either to her left or her right. There was nothing to obstruct her vision. After she came over the crest of the hill she saw a dark unlighted object partly in the middle lane and partly in the lane next to the divider about a car length away. She immediately applied her brakes, did not change the direction of her travel, and the left front of her auto came into collision with the right rear of Mr. Kaelin's car, knocked it in a counter-clockwise direction until it came to a stop facing east and west on the highway, partly in the median and partly in the center northbound traffic lanes. At the time of impact she had slowed her automobile slightly, perhaps as much as 5 m. p. h. She never saw the pick-up truck prior to the collision with the Kaelin car.

■ Plaintiff has the burden to make his case on the theory of law he chooses to submit to the trier of fact, in this instance the jury, and in doing so he must remove it from the field of conjecture and establish it by substantial evidence of probative value, or by inferences reasonably to be drawn from the evidence. *Berry v. McDaniel,* 269 S.W.2d 666, 670[5] (Mo.App.1954). To make a submissible case on the theory of failure to keep a careful lookout plaintiff must adduce substantial evidence that (1) the defendant saw, or in the exercise of the highest degree of care could have seen plaintiff, and (2) that the defendant at that time and place where he saw or could have seen plaintiff could have, in some manner, acted so as to avoid the accident or injury. *Creech v. Riss & Company,* 285 S.W.2d 554, 562 (Mo.1955); *Stegall v. Wilson,* 416 S.W.2d 658, 662[2] (Mo.App.1967); *Page v. Baxter,* 503 S.W.2d 32, 34[2] (Mo.App.1973). The object and purpose of the strict requirement that persons operating motor vehicles keep a proper lookout upon the public streets and highways of this state is that they may acquire knowledge of the presence of other persons and objects on such public streets and highways and an awareness of dangerous situations and conditions. It is only by reason of that knowledge and awareness that the operators of motor vehicles may take appropriate precautionary measures to avoid injury to themselves and other persons within an existing area of peril. *Miller v. St. Louis Public Service Company,* 389 S.W.2d 769, 771[2] (Mo.1965).

■ Nor is this heavy duty lessened any by the fact the operation of the motor vehicle is during the nighttime, for a motorist has a duty to maintain a lookout at night for other travelers upon the street or the highway and his liability extends to discoverable as well as discovered peril. *McFarland v. Wildhaber,* 334 S.W.2d 1, 3[4] (Mo.1960).

■ To fulfill this duty, the motorist is required to look in such an observant manner as to enable him to see what a person in the exercise of the highest degree of care for the safety of himself and others would be expected to see under the same or similar circumstances. *Mormino v. United States,* 249 F.Supp. 981, 982[3] (E.D.Mo. 1966). Whether the failure to keep a careful lookout in any direction at a particular time or place constitutes negligence depends on the conditions and circumstances then and there existing, and is usually a jury question. *Coulter v. Bi-State Development Agency of Missouri-Illinois Metropolitan Dist.,* 434 S.W.2d 793, 795[3] (Mo.App. 1968).

■ Mrs. Cathey contends however, that plaintiff failed to make a submissible case because 1) there was no evidence that Mrs. Cathey could have seen the Kaelin's car before she reached the crest of the hill and 2) there was no evidence that thereafter Mrs. Cathey had the ability to avoid the collision. The thrust of this argument is that the first time Mrs. Cathey could see the Kaelin automobile, which was dark and unlighted at nighttime, was when Mrs. Cathey came over the crest of the hill, at a time when it was at most 100 feet north of the location of the Kaelin auto.

We conclude, from the evidence in this record viewed most favorably towards

plaintiffs' theory of the case, that the jury could as it obviously did, find that Mrs. Cathey could or should have discovered Mr. Kaelin and the automobile within which he was then and there positioned had she been keeping a careful lookout in time to swerve and avoid coming into collision with the Kaelin automobile and thereby injuring Mr. Kaelin.

While the parties to this suit persistently referred to that portion of Highway I–55 where it commenced to dip down to go under the railroad overpass and the Poplar Street Bridge as the "crest of the hill," it is clear from the evidence that one proceeding northwardly over and along that portion of the highway from some distance south of the scene of the occurrence is travelling on a level portion of the highway which is elevated above the level of the land surface to where the dip commences. However, since the parties have chosen to identify the beginning of the downgrade as the "crest of the hill," we shall also do so.

To make his case against Mrs. Cathey, Mr. Kaelin must borrow the best from conflicting evidence in his own case as well as inferences which a jury might, we believe, cull from defendant's evidence favorable to his theory. He must establish from this evidence that there was sufficient time and distance for Mrs. Cathey to be alerted to his perilous position and still avoid colliding with his car. We are here dealing with seconds in time and inches in distance.

There is evidence in the record that following the collision between the pick-up truck and the Kaelin auto, the pick-up truck came to a stop 40 to 50 yards—120 to 150 feet—north of the crest of the hill. Mr. Hutson, defendant's witness, testified to this on cross-examination after his recollec-

tion had been refreshed by use of a statement he had given to an investigator who had called on him at his home in December, 1970.[2] Mrs. Cathey testified that after the first collision both the pick-up truck and the Kaelin car came to a stop and that the pick-up truck did not proceed southwardly beyond the Kaelin auto. There is nothing in this record to indicate that the pick-up truck changed its position between collisions, but rather, that it continued to face southwardly and remained up against the metal divider on the west side of the northbound traffic lanes. The Kaelin car was astride the line dividing the median lane from the center traffic lane for northbound traffic, partially blocking the center lane. Whether the Kaelin car was in front of or to the rear of the pick-up truck prior to the second collision is not clear. However, Mr. Hutson testified that the Kaelin car was thirty feet north of the pick-up truck when he came upon the scene. No one testified to the length of the pick-up truck, but if the Kaelin car came to a stop in front of the pick-up truck following the first collision it would then have been less than 150 feet north of the crest of the hill by the length of the pick-up truck. There was evidence that a passenger car was 20 feet in length, and we believe that it would have been permissible for the jury to conclude that a pick-up truck could be 20 feet long also. If so, then the Kaelin car would be sitting either 130 or 100 feet north of the crest of the hill prior to the time Mrs. Cathey came upon the scene. These distances would of course vary depending upon whether the Kaelin car was abreast of or north of the pick-up truck at the time Mrs. Cathey ran into it.

Plaintiff adduced no evidence relative to stopping distances nor what distance it

**2.** Mrs. Cathey's counsel argues that this evidence by Mr. Hutson cannot be afforded any probative value as substantive evidence of the facts stated therein because it came in by way of impeachment. *Rogers v. Fiandaca*, 491 S.W.2d 560, 565[2] (Mo.1973) and *Woelfle v. Connecticut Mutual Life Insurance Co.*, 234 Mo.App. 135, 112 S.W.2d 865, 873[11] (1938). We conclude from reading the transcript that the evidence came in by using the statement to

refresh the witness' recollection and not by way of impeachment and the rule of those cases is not controlling here. In our calculations we have not considered Mr. Hutson's testimony relative to the position of the Kaelin car with respect to the pick-up truck following the second impact because there is no evidence how far northward that impact may have moved the Kaelin car.

would require for defendant Cathey to have swerved her car and have avoided colliding with the Kaelin car. Mrs. Cathey did. However, her expert's opinion as to stopping and swerving distances were based upon hypotheticals assuming speeds of 50–55 miles per hour and that to avoid colliding with the Kaelin car Mrs. Cathey would have to swerve a distance of 7 feet. He opined that because of the brightly lit overhead highway signs in the vicinity of the occurrence it would require a reaction time of 1½ seconds for a driver to adjust her eyes to the darker area below. Based on these factors, he concluded that Mrs. Cathey could have brought her car to a stop within 251 feet at 50 m. p. h. and within 289 feet at 55 m. p. h. He further testified that at 50 m. p. h. the Cathey automobile would have travelled 180 feet while swerving 7 feet, and at 55 m. p. h., 231 feet. He further conceded that with good vision and a clear road the average reaction time for a driver is ¾ to 1½ seconds under emergency conditions.

 In deciding this issue plaintiff is entitled to the benefit of defendant's evidence when it is consistent with his theory of the case. *Price v. Nicholson*, 340 S.W.2d 1, 4[1] (Mo. banc 1960). We are of the opinion that under this evidence plaintiff made a submissible case against Mrs. Cathey, because while the jury was not bound by her expert witness' testimony, it could, nevertheless, reason from it, without resorting to guesswork and conjecture, that if, as her counsel conceded by his hypothetical questions propounded to the expert witness, she had swerved a distance of 7 feet once she saw or in the exercise of the highest degree of care could have seen the Kaelin auto sitting partially in the middle lane in which she was proceeding northwardly, she could have avoided the collision and damage and injuries to Mr. Kaelin.

The jury could have computed that if Mrs. Cathey was travelling at a speed of 45 m. p. h. she was travelling 66 feet per second. Allowing her the average reaction time of ¾ seconds, she would have travelled

a distance of 49.5 feet between the time she first saw, or in the exercise of the highest degree of care should have seen, the Kaelin car astride the median and center northbound traffic lanes while it was approximately 130 feet north of the crest of the hill, and she could have commenced turning the steering wheel of her car to swerve to the right and avoided colliding with the Kaelin auto. This would leave her approximately 80.5 feet to swerve a distance of 7 feet, a distance her counsel concedes would have avoided the collision by reason of the inclusion of this figure in his hypothetical questions. If, as her expert opined, she could at 50 m. p. h. swerve 7 feet in 70 feet, it would appear logically that it would take her a shorter distance to swerve that same 7 feet at 45 m. p. h. The Supreme Court of Missouri has said in *Brown v. Callicotte*, 73 S.W.2d 190, 193[1] (1934): "It is too generally and well known to require formal proof that present day automobiles respond quickly and accurately to the touch of the driver's hand on the steering wheel. The necessary impulse may be supplied in an instant." We hold, that under the facts in evidence, whether Mrs. Cathey was negligent in failing to keep a careful lookout was a jury question and the trial court did not err in so concluding.

Defendant Cathey's second point, that a failure on Mr. Kaelin's part to make a submissible case on one of the disjunctive theories submitted against Mrs. Cathey entitles her to a new trial is found to be without merit by reason of our holding with respect to her first point and we therefore rule both Points I and II against Mrs. Cathey.

Mrs. Cathey's third point is that the trial court prejudicially erred in denying her trial counsel the right to comment in closing argument on the failure of Mr. Kaelin to meet his burden of proof by producing evidence to show that Mrs. Cathey had the ability to avoid the collision after she could have seen the Kaelin automobile.

 We have reviewed the argument of Mrs. Cathey's counsel and we are at a loss to understand the ruling of the court in the context in which it was made.

This incident in the argument came about when Mrs. Cathey's counsel was arguing the content of his expert's testimony on stopping and swerving distances. He then argued that plaintiffs' counsel had termed this testimony "ridiculous"—actually the term used was "incredible"—and proceeded to argue: ". . . Why didn't the parties who have the burden of proof bring in some evidence to show you that cars can be swerved or can be stopped in that distance, and they have the burden of proof." The objection was: "I object to that argument of counsel, placing the burden of something not required by law. It's an improper argument to the jury." The trial court sustained the objection; but following a conference at the bench out of the hearing of the jury plaintiffs' counsel moved for a mistrial for the reason defendant's counsel had placed the burden on plaintiff to submit evidence with respect to stopping distances which he contended was not required of plaintiff in this lawsuit. Defendant's counsel then responded: "The burden is on the plaintiff to prove their case and I have a right to argue that to the jury." The trial judge thereupon ruled: "That part of the objection will be overruled, but the objection to the last statement, has been sustained." Defendant's counsel did not request a clarification of this ruling and in the absence of such we are unable to determine whether the trial judge reversed his prior ruling sustaining the objection as originally stated or overruled it. On appeal it is the burden of the appellant to have made a record in the trial court to support its allegations of error and not leave the reviewing court to grope for meaning in rulings of this kind. We therefore rule this point against Mrs. Cathey.

Defendant Cathey's fourth and final point is that the trial court erred in striking from her First Amended Answer an allegation that Mr. Kaelin had made a claim and received payment of approximately $9,500.00 for damages, to which he was legally entitled, and had executed a release and covenant barring him from asserting any further claim on account of this occurrence against this defendant, because he had recovered said sum from the American Family Insurance Group for damages from the operator of the Nuelle pick-up truck. In the alternative, defendant Cathey also sought to have this sum of money deducted from any judgment Mr. Kaelin might obtain against her.

We have searched to no avail the transcript of the record for a copy of the motion to strike referred to in this point and the trial court's ruling on this motion. From a reading of the transcript of the pre-trial conference conducted on the morning of trial prior to the impanelling of the jury, we deduce that Mr. Kaelin had previously filed a written Motion to Strike that portion of Mrs. Cathey's First Amended Answer which alleged that since the Nuelle pick-up truck was being driven by a thief at the time of the first collision Mr. Kaelin "proceeded" against his own insurance carrier, the American Family Insurance Group, under the uninsured motorist coverage of his insurance policy, and collected from it $9,500.00 which he was in fact entitled to recover from the operator of the Nuelle pick-up truck because of the bodily injuries he had sustained in the collision; that Mr. Kaelin had executed a release or covenant barring him from asserting any further claim on account of the occurrence against her; or in the alternative, if the release and covenant aforesaid did not bar Mr. Kaelin's claim against her, then the sum of money he had received constituted a full and complete satisfaction of any claim he might have for his injuries and damages and thereby extinguished any claim he might have against her. As a third alternative, she further alleged that if the money Mr. Kaelin had received was not a full and complete satisfaction for his injuries and damages, then that sum should be deducted from any award or recovery plaintiff might obtain against her. What evidence was presented in support of this motion, if any, we are not privy to, and so far as we have been able to discern, copies of the alleged release or covenant were not attached to the Answer of Mrs. Cathey as exhibits. However, during the pre-trial conference aforesaid, it was made clear that Mr. Kaelin

did file such a Motion and it was sustained by some judge other than the one before whom the case came for trial.

Defendant Cathey, during the pre-trial conference, through her counsel advised the trial judge that she proposed to ask Mr. Kaelin about this matter because it was his position that the driver, whoever he was, was at least a joint tort feasor and if Mrs. Cathey was held liable she was entitled to credit or reduction of verdict for any amount which was paid to Mr. Kaelin by a joint tort feasor, and that this payment was the same as if it were made by a joint tort feasor. He also advised the trial judge that he would be entitled to an Instruction on the point, MAI 7.01 and 7.02. Mr. Kaelin's counsel took the position that his Motion to Strike had been sustained and that since his client had paid a premium he should be entitled to keep his money, and for the further reason that should Mr. Nuelle be held liable in the case and his insurance carrier had to pay the judgment, the proceeds received by Mr. Kaelin would have to be returned to the American Family Insurance Company. The trial court stated that that part had already been ruled on by the ruling on the Motion to Strike. Counsel for defendant Cathey then announced: "With such a ruling, I make an offer here, to preserve our point so we can raise it on appeal." The objection of Mr. Kaelin was then sustained.

■ With the record in this state, we rule this point against defendant Cathey. If any evidence was ever presented in the trial court as to the nature of any documents signed by Mr. Kaelin upon receipt of the monies paid to him by his insurance carrier under the uninsured motorist provisions of his insurance policy, it has not been made a part of this record on appeal. Furthermore, the general rule in this state is that payments made under a policy of insurance by the insured's own insurance company to a plaintiff for which the plaintiff has paid a premium do not inure to the benefit of the tort feasor. No money here was received from the driver of the pick-up truck nor for any liability assumed on his behalf; rather, it would appear that the plaintiff received these funds by reason of a contract of insurance between himself and his insurer and defendant Cathey is not thereby entitled to any benefits thereby. This rule, the Collateral Source Rule, is applicable here and we are shown no reason for distinguishing payments made under the provisions of an insurance policy covering one injured by an uninsured motorist from other instances where it has been brought into play. *Collier v. Roth*, 434 S.W.2d 502, 506[5] (Mo.1968).

We affirm the judgment of the trial court on Count I of Mr. Kaelin's Second Amended Petition as to defendant Cathey.

### III.

### THE LORNA KAELIN APPEAL

■ Lorna Kaelin, the wife of plaintiff Harold V. Kaelin, joined her husband in this cause and in Count II of plaintiffs' Second Amended Petition brought suit against both defendants for loss of consortium and damages. The trial jury, although returning an award of damages for Mr. Kaelin against defendant Cathey on Count I of the Second Amended Petition found in favor of Mrs. Cathey and against Mrs. Kaelin on the second count. On appeal Mrs. Kaelin contends that she was, as a matter of law, entitled to a judgment against Mrs. Cathey on her loss of consortium count or to a new trial on the issue of damages only. The case of *Pietrowski v. Mykins*, 498 S.W.2d 572, 580[9] (Mo.App.1973) is controlling here and having affirmed Mr. Kaelin's judgment against Mrs. Cathey on her cause of action, we now hold that the judgment on Count II must be set aside and Mrs. Kaelin have a new trial limited to the issue of damages only.

We affirm the judgment of the trial court on Count I of plaintiffs' Second Amended Petition but we reverse and remand the judgment on Count II of said petition for proceedings in accord with our holding.

CLEMENS, P. J., and STEWART, J., concur.