**WINTERS EXCAVATING, INC.,**
**Plaintiff–Appellant,**

v.

**WILDWOOD DEVELOPMENT, L.L.C.,**
**Allen Surveying, Inc., and S.G. Duncan**
**Construction, Inc., Defendants,**

**Reinvestment Enterprises, L.L.C.,**
**and First Bank Of The Lake,**
**Defendants–Respondents.**

No. SD 30612.

Missouri Court of Appeals,
Southern District,
Division One.

May 24, 2011.

Gregory David Williams, Williams Law Firm, Sunrise Beach, MO, for Appellant.

Michael L. McDorman, Lake Ozark, MO, for Respondent First Bank of the Lake.

John David Landwehr, Jefferson City, MO, for Respondent Reinvestment Enterprises, L.L.C.

GARY W. LYNCH, Judge.

Winters Excavating, Inc. ("Winters") filed an action seeking to enforce its mechanic's lien against certain real estate in Camden County and for recovery based on quantum meruit against the former and present property owners for excavation services it provided in the development of the real estate. The trial court, finding that Winters's mechanic's lien was invalid and unenforceable, denied its petition to enforce but entered judgment in its favor in quantum meruit against Wildwood Development, L.L.C. ("Wildwood"), a former owner of the real estate. Winters appeals the trial court's denial of its petition for enforcement of its mechanic's lien. Finding no reversible error as alleged by Winters, we affirm.

### Factual and Procedural Background

Wildwood was organized by Tracy White, Sr., Leland Nollau, and Jerry Buck for the purpose of constructing a real estate development at Lake of the Ozarks. On July 4, 2004, Wildwood acquired the real property for the development, which was to be known as Diamond Pointe.[1] Fi-

---

1. On April 20, 2005, Tracy L. White, Sr., Leland C. Nollau, and Jerry Buck, as owners,

nancing for Wildwood's construction project was obtained in part from First Bank of the Lake ("First Bank") in Lake Ozark and was secured in part by deeds of trust on the real estate.

Initially, Winters was subcontracted for excavation work on an oral time-and-materials basis by the general contractor for the project, Constructive Engineering Design, Inc. ("CED"). Winters began work on May 3, 2005, clearing and preparing the site for development. Subsequently, Winters executed three subcontracts with CED: one provided a fixed sum for road and storm drainage excavation; another designated a maximum price for sanitary sewer service on a per-unit and rock-removal cost basis; and the third designated a maximum price for potable water service on a per-unit and rock-removal cost basis. Under these subcontracts, CED was designated as contractor, Winters as subcontractor, and Diamond Pointe Development as owner. The total amount due to Winters under the subcontracts upon completion was $520,084.95.

On October 19, 2005, Wildwood terminated CED as general contractor, and CED notified Winters of its termination, requesting a final invoice for work performed.[2] The three subcontracts executed by Winters as subcontractor were terminated by CED, and Winters was paid in full for all work performed as a subcontractor under CED.

At the request of Wildwood through its agent Nollau, Winters continued work on the project on October 20, 2005, and for some time thereafter, ultimately completing the work described under the subcontracts with CED.[3] Winters's principal agent, Everett Winters, Jr., knew that Nollau, White, and Buck were the owners of the real estate and that Winters was an original contractor with those individuals, "whatever entity they may have formed" to build the development.

After the termination of CED, Nollau directed Winters's work and was present at the worksite almost every day to supervise the project. The parties agreed that Winters would be compensated on a time-and-materials basis without a fixed price or written contract. Initially, Winters submitted hand-written invoices for work performed on a monthly basis, which were delivered to either Nollau or White. At Nollau's direction, Winters's invoices identified Diamond Pointe Development, L.L.C., as the customer but Winters received its payments from Wildwood.

Commencing on August 25, 2006, Winters began submitting computer-generated invoices for work performed. These invoices itemized the services rendered, the previous balance carried forward, payments received, and the current amount due. The reverse side of the invoices contained the terms and conditions of payment and the requisite statutory lien notice pursuant to section 429.012.[4] Invoices submitted by Winters prior to this time did not contain this notice, and all such invoices had been paid. Winters rendered

registered the fictitious name "Diamond Pointe" with Missouri's Office of the Secretary of State.

2. Apparently, S.G. Duncan Construction, Inc., succeeded CED as general contractor for the project, however, Winters does not allege or contend that it was a subcontractor of this successor general contractor.

3. In response to a hearsay objection to this testimony, Winters's counsel stated to the trial court, "we are certainly entitled to prove up the elements of our contract between Wildwood and Winters Excavating that then becomes the foundation for the mechanic liens."

4. References to section 429.012 are to RSMo 2000.

excavating services for water, sewer, and roadwork until March 2007, when it terminated its services due to delinquencies in payments from Wildwood.

Wildwood was divested of its interests in the real estate through foreclosure sales on May 31, 2007. First Bank was the purchaser. On June 21, 2007, First Bank conveyed the real property to Reinvestment Enterprises, L.L.C.

Winters filed its statement of mechanic's lien on June 21, 2007. Winters claimed that $268,381.06 was due under a contract with Wildwood. Winters designated "Winters Excavating, Inc." as "Original Contractor" and named Wildwood as "Property Owner." In its invoice attached thereto, Winters identified its customer as "Diamond Pointe Development LLC." Winters's invoice indicates that work was authorized by "Leland Nolluu [sic] of Wildwood Development" and a signature line provided thereunder is apparently signed by Nollau.

On December 19, 2007, Winters filed a two-count petition requesting enforcement of its mechanic's lien against the real estate and asserting a claim in quantum meruit against Wildwood, First Bank, and Reinvestment Enterprises, L.L.C. Winters filed its first amended petition on August 12, 2009. In its count for enforcement of its mechanic's lien therein, Winters asserted that following Wildwood's termination of CED as general contractor, "Diamond Pointe Development LLC assumed [Winters's] subcontracts and agreed to pay for all of the excavation services which were to be provided thereunder[.]" Winters further alleged that it "fully complied with the requirements of Chapter 429 RSMo[,]" claimed damages in the amount of $268,381.06, plus interest and costs, and prayed that "all rights to the real property of the named Defendants be found and adjudged to be subordinate and inferior to said special lien in favor of [Winters]."

Following trial, the circuit court entered its judgment denying enforcement of Winters's mechanic's lien against First Bank and Reinvestment Enterprises, L.L.C. The trial court found that Winters was an original contractor during the period between October 20, 2005, and March 2006, and as such, its failure to provide the requisite notice to owner as provided under section 429.012.1 rendered its mechanic's lien invalid and unenforceable. On Winters's claim in quantum meruit, the trial court granted judgment in favor of Winters and against Wildwood for the balance due for Winters's excavating services. Winters appeals that portion of the judgment denying enforcement of its mechanic's lien against First Bank and Reinvestment Enterprises, L.L.C., respondents herein.

### Standard of Review

■ Upon review of a court-tried mechanic's lien action, the trial court's judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Bullmaster v. Krueger*, 151 S.W.3d 380, 384 (Mo.App.2004). In conducting our review,

we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the judgment and disregard all evidence and inferences to the contrary. *Blair v. Blair*, 147 S.W.3d 882, 885 (Mo.App.2004). Due regard shall be given to the opportunity of the trial court to have judged the credibility of witnesses. *Foster v. Village of Brownington*, 140 S.W.3d 603, 607 (Mo. App.2004) (citing Rule 84.13(d)(2)). Furthermore, in making credibility determinations, the trial court may believe none, part, or all of a witness's testimo-

ny. *In re Marriage of Thomas,* 21 S.W.3d 168, 177 (Mo.App.2000). As a result, issues about the credibility of witnesses are for the trial court to resolve and are not matters that appellate courts can review. *Id.* *Just Enter., Inc. v. Spruce,* 243 S.W.3d 549, 550 (Mo.App.2008). While we are bound by the trial court's determinations on evidentiary and factual evaluations, our review on issues of law is *de novo,* so that we accord no deference to the trial court's conclusions of law. *Glenstone Block Co. v. Pebworth,* 264 S.W.3d 703, 710 (Mo.App. 2008).

### Discussion

### Mechanic's Lien Overview

A remedy for nonpayment of labor, equipment, or materials contributed by contract to the improvement of property is provided by statute through mechanic's lien laws under Chapter 429, RSMo. *Lake Ozark Constr. Inds., Inc. v. Osage Land Co., L.L.C.,* 168 S.W.3d 471, 475–76 (Mo.App.2005). Derived solely from legislative enactment, mechanic's liens constitute a charge on the land to secure a priority of payment for labor and materials contributed to the improvement of property, based on the principle that those who have contributed labor or material to the improvement of property are entitled to look to the property for compensation. *Id.* Reasonable and substantial compliance with applicable statutes is essential to secure a mechanic's lien. *Id.* at 476. A party seeking to enforce a mechanic's lien bears the burden of proving compliance with the essential elements of the applicable statutes. *Glenstone Block Co.,* 264 S.W.3d at 711.

Section 429.010 provides that any person who contracts with the owner of property to provide or furnish labor, equipment, or materials for any building or improvements upon the owner's property shall have a lien upon the property on which such building or improvements are situated, upon compliance with the provisions of sections 429.010 to 429.340. Pursuant to this section, "[t]he owner, his agent, contractor, or subcontractor of the property must have contracted for improvements or materials furnished to the property." *Midwest Floor Co. v. Miceli Dev. Co.,* 304 S.W.3d 243, 246–47 (Mo.App. 2009).

The mechanisms provided under Chapter 429 for enforcement of mechanic's liens vary according to the status of the lien claimant. The claimant's status is material because different notice requirements, which are conditions precedent to the validity of any mechanic's lien, are imposed according to whether the claimant was an original contractor or a subcontractor. *Dave Kolb Grading, Inc. v. Lieberman Corp.,* 837 S.W.2d 924, 935 (Mo.App.1992). This variance between notice requirements is based upon "the discrepancy between the owner's knowledge in dealing with an original contractor and the owner's knowledge in dealing with a subcontractor." *Id.* at 936.

Relevant to the issues raised and discussed herein, section 429.012 provides:

1. Every original contractor, who shall do or perform any work or labor upon, or furnish any material, fixtures, engine, boiler or machinery for any building, erection or improvements upon land, or for repairing the same, under or by virtue of any contract, ... shall provide to the person with whom the contract is made or to the owner if there is no contract, prior to receiving payment in any form of any kind from such person, (a) either at the time of the execution of the contract, (b) when the materials are delivered, (c) when the work is

commenced, or (d) delivered with first invoice, a written notice which shall include the following disclosure language in ten-point bold type:

NOTICE TO OWNER

■ FAILURE OF THIS CONTRACTOR TO PAY THOSE PERSONS SUPPLYING MATERIAL OR SERVICES TO COMPLETE THIS CONTRACT CAN RESULT IN THE FILING OF A MECHANIC'S LIEN ON THE PROPERTY WHICH IS THE SUBJECT OF THIS CONTRACT PURSUANT TO CHAPTER 429, RSMO. TO AVOID THIS RESULT YOU MAY ASK THIS CONTRACTOR FOR "LIEN WAIVERS" FROM ALL PERSONS SUPPLYING MATERIAL OR SERVICES FOR THE WORK DESCRIBED IN THIS CONTRACT. FAILURE TO SECURE LIEN WAIVERS MAY RESULT IN YOUR PAYING FOR LABOR AND MATERIAL TWICE.

2. Compliance with subsection 1 of this section shall be a condition precedent to the creation, existence or validity of any mechanic's lien in favor of such original contractor.

3. Any original contractor who fails to provide the written notice set out in subsection 1 of this section, with intent to defraud, shall be guilty of a class B misdemeanor and any contractor who knowingly issues a fraudulent lien waiver or a false affidavit shall be guilty of a class C felony.

Section 429.012's notice-to-owner requirement applies only to original contractors.[5]

### Winters Contends the Trial Court Erroneously Applied Section 429.012

Winters raises three claims of trial court error, each relating to the trial court's finding that Winters, as an original contractor, failed to provide the required notice to owner, as provided under section 429.012, and such failure rendered Winters's mechanic's lien invalid and unenforceable.

■ Each of Winters's three points fails to comply with Rule 84.04 in at least one similar respect. That rule requires that each point identify the challenged trial court ruling, state the legal reasons for the claim of reversible error, and explain why those legal reasons support the claim of reversible error. Rule 84.04(d)(1). None of Winters's points state a legal reason for the claim of reversible error. While this omission might impede appellate review in most instances, it does not here because we can deduce Winters's legal reason for each point from our standard of review and Winters's omission of any argument related to three of the four areas within that standard. *See* Standard of Review,

---

**5.** Section 429.100 establishes the requisite notice requirements for subcontractors seeking to enforce a mechanic's lien and provides, in part, that "[e]very person except the original contractor, ... shall give ten days' notice before the filing of the lien, ... to the owner, owners or agent, or either of them, that he holds a claim against such building or improvement, setting forth the amount and from whom the same is due." The purpose is to provide notice of outstanding subcontractor claims to the owner so that the owner may withhold payment from the original contrac-

tor and avoid double payment. *Schott Elec. Distrib., Inc. v. Mac Elec., Inc.*, 998 S.W.2d 566, 568 (Mo.App.1999). "[T]he property owner does not contract with a subcontractor and does not know if the subcontractor has been paid; thus the owner is entitled to ten days' notice before a subcontractor can file a lien." *Dave Kolb Grading, Inc.*, 837 S.W.2d at 936. Such notice is not required of original contractors because the owner knows whether the original contractor has been paid. *Bledsoe Plmbg. & Htg., Inc. v. Brown*, 66 S.W.3d 169, 171 (Mo.App.2002).

*supra.* Winters proffers no argument that the failure-to-provide-notice finding by the trial court is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares the law. Rather, under each point, Winters argues that the trial court erroneously applied section 429.012 to require notice to the owner. Based upon this deduction, we can proceed to further consider each of Winters's points because this particular noncompliance with Rule 84.04 does not impede our disposition of the case on its merits. *See In re Marriage of House,* 292 S.W.3d 478, 482 (Mo.App.2009).

### Winters Contracted with the Owner

■ In its first point, Winters asserts that the section 429.012.1 notice to owner was not required from Winters, in that Wildwood "utilized the unregistered trade name 'Diamond Pointe Development, LLC' in conducting business with [Winters] such that [Winters] was unable to determine that it was contracting with the Owner of the property[.]" Winters's argument under this point rests on its contention that it was not an original contractor, as found by the trial court; rather it continued to act as a subcontractor under what it believed to be the original contractor, namely Diamond Pointe Development, L.L.C.

Winters factually supports this point by directing us to Nollau's testimony that he instructed Winters to issue its invoices to Diamond Pointe Development, L.L.C., but then paid for the invoices by checks issued from Wildwood, and by relying upon the testimony of its agent, Everett Winters, Jr. From this evidence, Winters insists that, due to Wildwood's use of "misleading" information, Winters mistakenly believed another entity—Diamond Pointe Development, L.L.C.—was the original contractor on the development project and

that Winters was its subcontractor. This view of the evidence, however, does not comport with our standard of review that requires us to disregard contrary evidence and inferences and to defer to the trial court's witness-credibility determinations. *See* Standard of Review, *supra.* By characterizing the information provided by Nollau and Wildwood as "misleading," Winters is relying upon an inference contrary to the judgment. Similarly, the trial court was not required to believe any of the testimony of Everett Winters, Jr., concerning Winters's belief that it was a subcontractor of Diamond Pointe Development, L.L.C. When our standard of review is properly applied to consider only the evidence and inferences favorable to the trial court's judgment, the evidentiary basis, which Winters relies upon to support its claim that the trial court erroneously applied section 429.012, disappears. Thus, Winters's first point is denied.

### Wildwood did not Assume Winters's Subcontracts with CED

■ Central to Winters's claims of error under its second and third points is its contention that the original subcontracts between CED and Winters were "assumed" by Wildwood after CED was terminated, and therefore Winters was not an original contractor until the work provided for under the original CED subcontracts was completed. Winters alleges in its second point that the trial court erred in finding that Winters failed to provide the required notice to owner and in denying enforcement of its mechanic's lien, in that it provided the requisite notice to owner once work outside of the scope of its original subcontracts proceeded, at which time Winters's status became that of an original contractor.[6] In its third point,

6. Winters's second point fails to cite to any legal authority in support of its argument, as

Winters claims it substantially complied with the notice-to-owner requirement, in that the requisite notice was provided on invoices to Wildwood for work performed outside the scope of the work provided under the original subcontracts, commencing in August 2006.[7] Our determination that there was no evidence that Wildwood "assumed" Winters's subcontracts with CED after CED terminated its contracts with Winters is dispositive of both points.

Winters claims that "the relationship between [it] and Wildwood changed from a subcontractor for CED, to subcontractor whose contract with a terminated general contractor was assumed by the owner, to a contractor dealing with the owner." Winters further contends that the requisite notice was provided when, in the summer of 2006, Wildwood expanded the scope of the work it requested of Winters beyond that which was described under Winters's subcontracts with CED to include additional work on a condominium site. At that time, Winters claims, it "was no longer working on completion of its CED subcontract work, and began including the statutory lien notice on the reverse side of all of its invoices to Wildwood for work on the condominium site."

Winters raised this claim in its count for enforcement of its mechanic's lien in its amended petition, contending that "Diamond Pointe Development LLC assumed [Winters's] subcontracts and agreed to pay for all of the excavation services[.]" How-ever, Winters's evidence at trial did not support this claim. Rather, there was substantial evidence presented that the subcontracts were terminated at the time when CED was terminated as general contractor, which supports the trial court's finding that Winters performed as an original contractor from October 20, 2005, until March 2007 at the direction of Wildwood.

The evidence presented at trial, viewed in the light most favorable to the judgment, as we are required to do, established the following. Initially, Winters was employed as a subcontractor under CED, the general contractor. Winters, as subcontractor, contracted with CED to provide excavation and utility services pursuant to three separate written contracts, admitted at trial as Winters's Exhibits 20, 21, and 22. The first contract, Exhibit 20, was dated and executed on August 19, 2005. The second and third contracts were dated and executed on September 2, 2005. All three provided for payment on a lump-sum basis. Section 7.4 of each contract contained a provision for possible assignment of the subcontract in the event that the prime contract between the owner and the original contractor was terminated. It provided that the original contractor may assign the subcontract to the owner upon agreement by the owner to assume all its obligations.

On or about October 19, 2005, Wildwood terminated CED as original contractor on

---

required under Rule 84.04(d)(5), and provides no explanation for such omission. *See Carden v. Mo. Intergovt'l Risk Mgmt. Ass'n*, 258 S.W.3d 547, 556 (Mo.App.2008). While citation to legal authority in every point is important, it is indispensable in a point where an appellant claims that the trial court erroneously applied the law. Because, however, the resolution of this point involves an issue in common with Winters's third point, we address both points together on the merits of that issue.

7. Generally, mechanic's lien statutes should be liberally construed in favor of the enforcement of such a lien. *Lake Ozark Constr. Inds., Inc. v. Osage Land Co., L.L.C.*, 168 S.W.3d 471, 476 (Mo.App.2005). However, liberal construction in favor of enforcement does not relieve the lien claimant of substantial compliance with the applicable statutes. *Fulkerson v. W.A.M. Investments*, 85 S.W.3d 745, 748 (Mo.App.2002).

the development project. Defendant's Exhibit F consists of three letters from the project assistant of CED, dated October 19, 2005, notifying Winters of CED's termination as original contractor. Each letter stated that the subcontracts between CED and Winters were "terminated on October 20, 2005 due to the termination of the prime agreement between [CED] and [Wildwood] ('Between Owner and Contractor')." Apparently because all of these letters expressly terminated the subcontracts, none made any mention about an assignment of the subcontracts to Wildwood, which was referred to in each letter as the "Owner."

At trial, Leland Nollau testified. When asked if there was an assignment of CED's contract with Winters, presumably to Wildwood, Nollau responded, "No, not that I know of." Nollau acknowledged that he talked to Everett Winters, Jr., when CED was terminated and "had him come in and do it by the hour." Nollau further stated there was no written contract between Wildwood and Winters.

Everett Winters, Jr., testified and stated that Nollau approached him prior to the termination of CED, advised him that CED might be terminated, and inquired as to whether Winters would be interested in continuing to work on the development project following CED's termination. He, on behalf of Winters, agreed. There was no written contract between Winters and Wildwood or Diamond Pointe Development, L.L.C., and he acknowledged that he orally contracted with Wildwood to continue providing excavation services for the project with compensation based on an hourly and per-load basis. He conceded that after CED was terminated as original contractor, Winters's work was directed by Wildwood. While he acknowledged that Winters received the three letters advising it of CED's termination and the termi-

nation of Winters's subcontracts with CED, neither he nor Winters offered any evidence that the subcontracts with CED were assigned, or that Wildwood "assumed" the subcontracts, following CED's termination.

In actions to establish and enforce mechanic's liens, " 'the averments must plead and the evidence must prove the statutory elements before recovery is permitted.' " *Bullmaster*, 151 S.W.3d at 385 (quoting *Kenny's Tile & Floor Covering, Inc. v. Curry*, 681 S.W.2d 461, 472 (Mo.App.1984)). The burden rested upon Winters at trial to make a case on the theory of law it chose to submit to the trier-of-fact, "and in doing so, [Winters] must remove it from the field of conjecture and establish it by substantial evidence of probative value, or by inferences reasonably to be drawn from the evidence." *See Kaelin v. Nuelle*, 537 S.W.2d 226, 233 (Mo.App.1976). "Statements of fact in a brief which are unsupported by the record are not evidence." *In re Marriage of Osborne*, 895 S.W.2d 285, 289 (Mo.App.1995). The absence of supporting evidence for Winters's contention that its subcontracts with CED were assigned to Wildwood is fatal to Winters's claims in these two points. Accordingly, Winters's second and third points are denied.

### Decision

The trial court's judgment is affirmed.

BARNEY, P.J., and BURRELL, J., concur.