Robert BROWNSTEIN, d/b/a
Brownstein Associates,
Appellant,

v.

RHOMBERG–HAGLIN AND ASSOCI-
ATES, INC., a corporation, and Arthur
Muskin, Respondents.

No. 73639.

Supreme Court of Missouri,
En Banc.

Jan. 28, 1992.

**14**

Richard Wunderlich, Kellee A. Koncki, Clayton, for appellant.

Am. Institute of Architects, Mo. Council of Architects, American Consulting Engineers Council, Consulting Engineers Council of Missouri, National Society of Professional Engineers & Missouri Society of Professional Engineers, G. William Quatman, Thomas A. Sheehan, Kansas City, amicus.

Robert C. Jones, Robert E. Jones, St. Louis, for respondents.

RENDLEN, Judge.

Transferred after opinion in the court of appeals, this case requires construction of § 429.015, RSMo 1978, the Architectural Lien Statute. We affirm.

The dispositive facts found principally in the parties' stipulation are these: In May 1982, defendant Rhomberg–Haglin (Rhomberg) contracted to purchase a building at 801–805 North Second Street, then known as the "Levee Building" and later as the "Trader's Building" (Building), from Mil–Cliff Corporation (Mil–Cliff). On July 26, plaintiff and Rhomberg executed a "Standard Form Agreement Between Owner and Architect" (Agreement) in which plaintiff, d/b/a Brownstein Associates, a licensed architectural firm, agreed to provide architectural services for the building's rehabilitation and three days later plaintiff was instructed to prepare "as-built" drawings for the project.[1]

When the land sale was closed January 3, 1983, Rhomberg took Mil–Cliff's quitclaim deed to the property. Three security instruments, all filed January 4, were employed to provide financing for the purchase: 1) a deed of trust securing payment of $188,278.30 to Mark Twain Parkway Bank (Mark Twain); 2) a $75,500.00 deed of trust to Mil–Cliff; and 3) a $75,000 deed of trust to Arthur Muskin (Muskin), a St. Louis businessman, who agreed to guarantee the deed of trust of Mark Twain Parkway in exchange for a fee of $87,500.00. The same day, Rhomberg directed plaintiff to proceed with the described architectural work under the agreement, which provided the price for plaintiff's services would be five percent (5%) of the estimated construction cost. The cost estimate, as determined by the selected general contractor, C. Rallo Contracting Co. (Rallo), Inc., was declared to be $2,107,937.00 on May 6, 1983, establishing plaintiff's fee at $105,000.00 plus. Rhomberg was to pay that fee by monthly installments but, in early 1983, halted payment and on May 5, plaintiff filed his architect's lien with the clerk of the St. Louis City Circuit Court.[2]

Thereafter Mark Twain assigned its note followed by the deed of trust to Muskin and on August 25, Muskin foreclosed, purchasing the property himself at the foreclosure sale.[3]

Intending to redo the building, Muskin at first examined the possibility of employing plaintiff and his architectural drawings but found that plaintiff's services were "packaged" or linked to Rallo as the designated general contractor. Muskin determined

1. "As built" drawings show the location of the walls, the size of the building, its structural integrity and those things necessary to render it safe for the intended use.

2. The parties stipulated that plaintiff complied with the notice and filing requirements of Chapter 429, RSMo 1978.

3. Rhomberg filed for bankruptcy and an order for relief pursuant to 11 U.S.C. chapter 7 was entered on May 15, 1984. The automatic stay was lifted to allow plaintiff to pursue its mechanic's lien claim and plaintiff's claim against Rhomberg was ultimately discharged in bankruptcy.

that Rallo's estimates were high and, looking elsewhere, retained Luer–Pope & Associates (Luer–Pope) to prepare preliminary drawings for the project. Sometime during the late 1970's, Luer–Pope had done certain preliminary work hoping to be employed by the then owners of the building; however, this anticipated arrangement failed to materialize and that early work was shelved.

Muskin conveyed the property August 1, 1985, to the Planned Industrial Expansion Authority (PIE) of St. Louis, which immediately transferred to Trader's Redevelopment Corporation, a company owned by Trader's Partnership. Muskin, a general partner of the latter and president of Trader's Redevelopment Corporation, promptly contracted with Luer–Pope to develop drawings for the building, which was eventually rehabilitated under plans they submitted. Neither Rallo nor Rhomberg was involved.

Plaintiff petitioned to enforce his architect's lien on November 2, 1983, and, during the trial, five years hence, only three witnesses, the plaintiff, Muskin and Jack Luer of Luer–Pope were called. On January 29, 1990, Judgment in favor of defendants on all counts was entered in which the trial court found that "[n]o actual construction, repair or improvement was undertaken utilizing [the] plans [prepared by plaintiff]," and that plaintiff's architectural lien could not attach under § 429.015, RSMo 1978; further, that plaintiff's lien failed because he had failed to contract with the owner of the land when agreeing to provide architectural services, and, finally, the foreclosure sale on Mark Twain Parkway Bank's deed of trust had extinguished plaintiff's lien.

■ In this bench tried case, we must sustain the judgment unless there is no substantial evidence to support it, or it is against the weight of the evidence or it erroneously declares or misapplies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

■ Plaintiff first attacks the trial court's holding that a lien may not attach unless architectural services were utilized in the actual construction or improvement of the property, a question of first impression for Missouri courts. Section 429.-015.1, RSMo 1978[4] in pertinent part provides:

> Every registered architect....who does any architectural....work upon or performs any architectural....service *directly connected* with the erection or repair of any building or other improvement upon land under or by virtue of any contract with the owner or proprietor thereof, or his agent, trustee, contractor or subcontractor, upon complying with the provisions of this chapter, shall have for his architectural....work or service so done or performed, a lien upon the building or other improvements and upon the land belonging to the owner or proprietor on which the building or improvements are situated, to the extent of one acre.

(Emphasis added.)

■ We are mindful that statutory liens of this sort are remedial, to be construed liberally in the favor of the lien claimant, *Maran–Cooke, Inc. v. Purler Excavating, Inc.*, 585 S.W.2d 38, 40 (Mo. banc 1979); however, the primary rule of statutory construction is to ascertain the legislative intent from the statute's language, to give effect to that intent if possible, consider the words in their plain and ordinary meaning, *Wolff Shoe Company v. Director of Revenue*, 762 S.W.2d 29, 31 (Mo. banc 1988), and when the language is unambiguous, we are afforded no room for construction. *Id.*, 762 S.W.2d at 31.

While this is the first opportunity for appellate review of § 429.015.1's phrase "directly connected," "direct" is an oft examined term. It has been described as a synonym for "proximate." *John Drennon & Sons Company v. New Hampshire Insurance Company*, 637 S.W.2d 339, 341 (Mo.App.1982). A "direct" cause of an event is that which in a natural and contin-

**4.** Although the 1978 version of the statute has been altered by amendment, those changes do not affect the applicable portions of the statute here involved.

uous sequence, unbroken by any new cause, produces the event and without which the event would not have occurred. *Id.* To hold that § 429.015.1 allows an architectural lien to attach where the services of an architect are not employed in "erection or repair of any building or other improvement" would fly against the plain meaning of the statute's terms.

As demonstrated by *Maran–Cooke, Inc., supra,* the words of the statute are controlling and, refusing to restrict the term "registered professional engineer" as applying only to individuals, we determined the statute required that engineering corporations too must register to qualify for the benefits of the lien statute, *id.;* this because the legislative mandate overrode equitable principles that might point to a different result. *Id.,* 585 S.W.2d at 41.

Plaintiff directs attention to opinions from sister states in attacking the trial court's interpretation of the statute. In this regard, opinions vary among the states and it is aptly noted:

> An architect may acquire a lien for his services where his plans and specifications are used in the construction of a building. While there is some authority holding that he may acquire a lien even though his plans and specifications are not used, ordinarily no lien may be allowed for plans and specifications not used. An architect may not be entitled to a lien for preparing plans and specifications for a building actually constructed on a different plan, after the plans for which the lien is claimed had been actually abandoned, but, where the fundamental principles of architects' plans are used in the construction of a building, the fact that the identical plans are not used has been held not to deprive the architects of their lien.

57 C.J.S. *Mechanics' Liens* § 36 (1948) (footnotes omitted). More particularly, Missouri appears to have uniquely worded its architectural lien law. In a statute similar to ours, Louisiana entitles architects to a lien on immovable property for professional services "rendered in connection with a work that is undertaken by the owner." LSA–R.S. 9:4801(5); *GRW Engineers, Inc. v. Elam,* 504 So.2d 117, 119 (La.App.1987). Though the statute is without the qualifier "directly" appearing in our version of the law, the Louisiana court interpreted its statute to require that the construction or improvement utilize the architect's plans or specifications, *Construction Engineering Co. of Louisiana v. Village Shopping Center, Inc.,* 168 So.2d 826, 830 (La.App.1964), and denied the lien because no actual construction had been undertaken though the architect had been properly employed and had rendered it services. *Id.*

■ Plaintiff insists that to deny the lien would thwart the legislative intent and avoid the underlying purpose of § 429.015; when clearly necessary the strict letter of the act must yield to the manifest intent of the legislature. *BCI Corporation v. Charlebois Construction Co.,* 673 S.W.2d 774, 780 (Mo. banc 1984). He points to an earlier pronouncement that the "General Assembly [enacted] Chapter 429 to grant a meaningful method of securing payment to those supplying labor, work and materials for improvements on real estate (the rational basis for which policy is obvious)." *Home Building Corporation v. Ventura Corporation,* 568 S.W.2d 769, 773 (Mo. banc 1978). However, plaintiff neglects to recite the Court's completed thought found in the statement, that "[the Builder] merely acquired a mechanic's lien *to the extent that it furnished work, labor and materials* for housing constructed on [the] property." *Id.* (Emphasis added.) Quite simply, it cannot be said the legislature intended mechanic's liens to attach where none of the labor or materials of the builder were used in the improvement of the property. A variety of remedies are available to such claimants, and the provisions of Chapter 429 are supplemental to traditional means of recovery. To qualify, the person seeking the lien must have provided in his professional capacity either labor or materials used for improving the land.

Though plaintiff complains such requirement departs from the holdings in prior cases, this Court has routinely decided there must have been labor or material

employed in improving the land for a lien to attach. Good examples are found in the cases plaintiff cites though he asserts they represent a contrary view. In *Oliver L. Taetz, Inc. v. Groff*, 363 Mo. 825, 253 S.W.2d 824 (1953), heating oil used to heat the building during construction to prevent fresh plaster from freezing was a lienable item. *Id.*, 253 S.W.2d at 831. There it was stated "[i]n order to maintain a lien for materials furnished, it is not necessary in all cases that such materials should actually have gone into the structure and form part thereof. It is sufficient that their use was necessary, and *they were, in fact, used or consumed in the building.*" *Id.* (Emphasis added.) In *Vasquez v. Village Center, Inc.*, 362 S.W.2d 588 (Mo.1962), certain grading was done preparatory to building a shopping center, but no further construction was undertaken and no shopping center was built, nevertheless the grading work was lienable, *id.*, 362 S.W.2d at 594, because it was considered as an integral part of the construction plan. *Id.* These cases reinforce the view that some connection between the labor or materials and the improvement to land is necessary for a lien to attach. To hold otherwise would empty the phrase "directly connected" of its meaning.

Examining the record to determine whether there is substantial evidence to support the trial court's findings that plaintiff's efforts were not "directly connected" to the rehabilitation of the building, we find his work included: preparation of the plans and specifications for the reconstruction and the services in aid of respondent's efforts to secure permits, certifications and licenses necessary for the project.

Plaintiff states in his brief that "[i]t is undisputed that no evidence was presented that established that [plaintiff's] work was actually used in [the] physical construction work performed," effectively conceding the trial court was correct in finding that "no actual construction, repair or improvement was undertaken utilizing" plaintiff's plans or specifications. This admission is supported by Muskin's testimony that Trader's Partnership did not use the plans or specifications of plaintiff when the building was eventually rehabilitated. Luer, the architect who drew the final plans, testified that although he had previously examined some of the material prepared by plaintiff, the final work was nonetheless his own. He stated, and the trial court found, there are a limited number of architectural variations available for historic buildings such as this, which explained many of the similarities between the architects' works.

We cannot lightly dismiss plaintiff's assertion that these similarities indicate Luer may have drawn upon plaintiff's work to produce his final product; however, Luer's testimony supported the trial court's holding and the record suffices to affirm the court's credibility call. The trial court in effect found Luer's testimony credible and we defer to such finding because of the vantage point enjoyed by the court when measuring the witness' sincerity as well as other intangibles not completely revealed by the record. *In re Adoption of W.B.I.*, 681 S.W.2d 452, 455 (Mo. banc 1984).

Plaintiff with no little justification further claims he did more than merely prepare architectural plans and specifications. He aided Rhomberg in securing government authorization to develop the property, and in obtaining historic certification in order to qualify the project for valuable tax benefits, as well as helping to secure interim and long-term financing.

The building is located in Laclede's Landing, an area under the jurisdiction of Laclede's Landing Redevelopment Corporation [5] (LLRC) which oversees such development, and before Rhomberg's project could commence, LLRC approval was required. In December 1982, plaintiff met with the Planning Committee of the LLRC and presented the architectural concept for the project. The following February, Rhomberg submitted its "Parcel Development Agreement" proposal to which proposal was attached the architectural drawings, a description of the work, descriptions of the building, and estimated costs of construction prepared by plaintiff. Based upon this

---

5. Organized under § 353.030, RSMo 1986, of the Urban Redevelopment Corporations Law.

proposal, LLRC approval was obtained in April 1983.

Rhomberg, to acquire special tax status, property tax abatements, and favorable financing through tax-exempt industrial revenue bonds, needed the designation "historic" building. In this connection it submitted to the National Park Service a "Historic Preservation Certification Application—Part 2" containing a detailed narrative of the proposed preservation and rehabilitation work prepared at least in part from plaintiff's drawings, specifications and calculations. Historic status was granted in April, 1983.

After Muskin purchased the property, he contacted Luer–Pope who like plaintiff before them provided assistance in acquiring LLRC's approval and "historic" status from the National Park Service. The extent Luer–Pope relied on or redrafted the prior submissions was disputed in the testimony. Luer conceded he had plaintiff's original work before him when preparing the new submissions for Muskin; however, it was an "Amended and Restated Parcel Development Agreement with an amended and restated Exhibit B attached" that Luer–Pope submitted to the LLRC and a new certification application was prepared for the National Park Service. The trial court noted that there were "many similarities" between plaintiff's submissions and Luer–Pope's but they were not "identical". Like the architectural plans and specifications, the similarities are largely explained by the limited number of uses and architectural variations involved with one hundred year old buildings.

Though the record reveals conflicting testimony as to the extent Luer–Pope may have relied upon plaintiff's earlier work when preparing the new submissions, at its most favorable to plaintiff, it would appear Luer–Pope used plaintiff's work as a guideline subject to revision and alteration, but this does not qualify as "directly connected" to the improvement of the land. Muskin necessarily was required to submit new proposals and applications before commencing reconstruction of the building. Luer–Pope contracted to prepare the new submissions and in so doing performed independently. "Direct" is defined as "proceeding from one point to another in time or space without deviation or interruption". *Webster's New Collegiate Dictionary* 320 (1981). The record is not sufficient to require reversal of the trial court's determination that plaintiff's work, though similar to that of Luer–Pope, was not directly used in the reconstruction of the building. Stated otherwise, the record supports the findings and judgment.[6]

Finally plaintiff in separate counts asserted error in the trial court's denial of his claim for unjust enrichment and unfair competition; however, because the court properly found plaintiff's plans were not used to improve the building, these claims must also fail. The judgment is affirmed.

All concur.

THOMAS, J., concurs in separate opinion filed.

BLACKMAR, J., concurs in opinion of THOMAS, J.

THOMAS, Judge, concurring.

I concur. The legislative history of § 429.015, RSMo 1978, is useful in resolving the main issue of whether the architect's plans and specifications must be used in the construction of the building as a prerequisite to the architect's lien attaching. In *Henges Co. v. Doctors' North–Roads Building, Inc.,* 409 S.W.2d 489, 495 (Mo.App.1966), it was decided that an architect could not obtain a lien under § 429.010, the general mechanics' and materialmen's lien statute, for the preparation of plans and specifications for an improvement to real estate because the statute specifically enumerates the bases upon which a lien may be established, and plans and specifications do not fall within either of the

---

**6.** The trial court had further found that plaintiff's claim failed because the foreclosure sale had extinguished any lien plaintiff may have had and plaintiff had failed to deal with the owner of the property at the time of contracting as required by the statute. We do not need to reach these issues today.

categorical bases statutorily prescribed. Following that decision, the legislature adopted § 429.015 in 1971. Thus, it is reasonable to view § 429.015 as a specialized mechanics' lien statute for architects.

The rationale for the general mechanics' lien statute is that where a materialman or worker contributes his material or services to the construction of an improvement on real estate, he has contributed to an increase in the value of the real estate. Because his material or services have been incorporated into the real estate, they likely will have lost their identity as his material or services, and thus it is impossible for him to repossess or reacquire the property that was originally his and for which he has not been paid. Under these circumstances, it is reasonable to grant the materialman or worker a lien on the real estate that roughly parallels his contribution to the increase in value created by the improvement to the real estate. To support this rationale, the cases underlying the general mechanics' and materialmen's lien statute require that the material or services furnished that gives rise to mechanics' lien must be traceable into the property or, at least, have been consumed in connection with the construction of the improvement to the real estate. This requirement insures that the person receiving the benefit of the mechanics' lien will have contributed to the increased value of the real estate subject to the lien.

As a specialized mechanics' lien statute for architects, it is reasonable to apply the same type of requirement to § 429.015 by requiring that the plans and specifications prepared by the architect that give rise to the unpaid account for which the architects' lien is claimed have been used in the construction or improvement of the real estate subjected to the lien. As with the general mechanics' and materialmen's lien statute, this insures that the services that give rise to the lien in fact resulted in an improvement and increased value in the real estate to which the lien attaches. The rationale that supports this type of requirement under § 429.010, the general mechanics' and materialmen's lien statute, likewise supports a similar requirement under § 429.015, which, because of its legislative history, could accurately be described as a specialized mechanics' lien statute for architects. I rely upon this rationale, as well as the reasoning set forth in the majority opinion, to support our affirmance of the trial court.