ALTOM CONSTRUCTION COMPANY, LLC, GREAT River Engineering of Springfield, Inc., Plaintiffs–Respondents,

v.

BB SYNDICATION SERVICES, INC., Michele McCue Trustee, Defendants–Appellants,

Hollister Interchange Development Company, LLC, Explosive Contractors, Inc., Gage Excavating, LLC, Justin Gage, Defendants–Respondents.

No. SD 30966.

Missouri Court of Appeals, Southern District, Division One.

Feb. 15, 2012.

---

Thomas M. Bradshaw, John R. Weisenfels, Kevin Mason, Kansas City, MO, for Appellants.

David A. Fielder, Springfield, MO, for Respondent Great River Engineering of Springfield, Inc.

James R. Fossard, Springfield, MO, for Respondent Altom Construction Company, LLC.

NANCY STEFFEN RAHMEYER, Judge.

This appeal arises from a judgment entered by the Circuit Court of Taney County in favor of Altom Construction Company, LLC ("Altom"), and Great River Engineering of Springfield, Inc. ("Great River"), (collectively, "Respondents"), against Hollister Interchange Development Company, LLC ("HIDC"), Gage Excavating, LLC ("Gage"), and BB Syndication Services, Inc. ("BBSSI"). The trial court found BBSSI "made a future advance deed of trust and construction loan" and recorded its deed of trust after it "knew that employment of subcontractors by the general contractor was contemplated and that the mechanics and material providers who were to provide labor and materials might file mechanic's liens against the property if their bills were not paid." As such, the court determined Respondents' liens to be superior to BBSSI's loan. We affirm the judgment.

As this was a court-tried case, "the judgment of the trial court will be affirmed unless it is not supported by substantial evidence, it is against the weight of the

evidence, or it erroneously declares or applies the law." *Glenstone Block Co. v. Pebworth,* 330 S.W.3d 98, 101 (Mo.App. S.D.2010). When exercising the power to set aside a decree or judgment on the ground that it is against the weight of the evidence, the appellate court should proceed with caution and with a firm belief that the decree or judgment is incorrect. *Id.; Jerry Bennett Masonry, Inc. v. Crossland Const. Co. Inc.,* 171 S.W.3d 81, 88 (Mo.App. S.D.2005). To make a determination of the sufficiency of the evidence, this Court accepts as true all evidence and inferences that are favorable to the trial court's judgment and disregards those inferences that are contrary. *Bush Const. Machinery, Inc. v. Kansas City Factory Outlets, L.L.C.,* 81 S.W.3d 121, 122 (Mo. App. W.D.2002). The validity of the trial court's judgment is presumed and the appellant carries the burden to demonstrate its incorrectness. *Glenstone Block Co.,* 330 S.W.3d at 101.

Viewed in the light most favorable to the verdict, the following evidence was adduced at trial:

In 2007, Gage and HIDC[1] planned to build a water park, an events or convention center, and condominiums or time share units on real property located on the southern side of Hollister, Missouri. The total cost estimate of the development was to be approximately one hundred fifty-five million dollars. Gage and HIDC were given funding for the project from BBSSI. To secure funding from BBSSI, HIDC provided BBSSI with a presentation package including income projections, site plans, potential cost estimates, land value projections, and other commonly used information within the industry, and a partnership agreement with Wilderness Resort Group, the operating entity on the project. BBSSI provided the project with a loan in the amount of "the lesser of: (i) $21,690,-00.00 or (ii) the lesser of 75% of the appraised market value of the land as of completion of the proposed infrastructure construction or 100%) of the total costs of the Project including the cost of acquisition of the Real Property." The parties dispute the purpose, character, and categorization of the loan.

HIDC and BBSSI entered into an agreement titled, "Interim Loan Agreement," ("Interim Loan"), which was secured by a mortgage titled, "First Deed of Trust, Assignment of Leases and Rents and Fixture Filing," ("Deed of Trust"); an advances agreement titled, "Interim Loan Disbursement Agreement," ("Disbursement Agreement"); and BBSSI required Gage and HIDC to enter into an excavation agreement, drafted partially by BBSSI's attorney, before they agreed to fund the project.

Altom and Great River understood the Deed of Trust to be a construction mortgage, a portion of which was to be used for the initial infrastructure improvements. The second page of the Deed of Trust reads, "This is a construction mortgage under Section 400.9.334, R.S.MO., as amended or renumbered." The parties also executed the Interim Loan which provided an assignment by HIDC of its development rights and construction plans over to BBSSI. The Interim Loan did not segregate loan amounts between the land acquisition and initial infrastructure improvements and categorized itself as a "construction loan." Similarly, the Disbursement Agreement did not differentiate

---

1. Justin Gage, the visionary of the project, is the owner of Gage Excavating, LLC, and part owner of HIDC.

loan amounts between land acquisition and initial infrastructure improvements.

HIDC, through Gage, hired Altom as a subcontractor to begin excavation work on the property. Altom and Gage agreed on the blasting and excavation price of $2.40 per cubic yard, plus the cost of the pre-blast survey. Altom received its payments directly from Gage. Altom hired Explosive Contractors, Inc. ("ECI") to provide the loading and discharging of explosives on the project. ECI provided Altom with blasting reports and such reports provided the cubic yard basis that, when multiplied by the $2.40 excavation cost per cubic yard, served as the disputed sum in Altom's mechanic's lien. Gage verified the blast reports to be true and accurate.

BBSSI hired its own inspectors, LM Consultants, to work with HIDC and monitor construction activities in order to verify the project's progress. HIDC also entered into an agreement with Great River for civil infrastructure design and production of construction plans and specifications. Under this agreement, Great River produced thirty-two pages of design development plans and construction specifications that were at the 60% level of detail. Included in these plans were civil site plans, grading plans, utilities, sanitary sewer, storm water, water lines, gas lines, erosion control, and landscaping. Mel Eakins, of Great River, testified that the construction plans were no further than 66.5% complete. All invoices in connection with the water park project were included in the lien statement.

The project came to a standstill when the Interim Loan funds were expended and further financing did not go forward in spite of Gage's continued attempts to obtain funding from BBSSI. Altom filed its petition to enforce its mechanic's lien in

May of 2009, naming BBSSI and trustee Michele McCue as parties regarding the Deed of Trust that BBSSI held on the real property. In July of 2009, Great River filed its petition to enforce a mechanic's lien, also naming BBSSI as the mortgagee of the real property.

In its first point, BBSSI argues that it holds a purchase money lien on the real property that has priority over the mechanic's liens held by Respondents even as to work done before the attachment of the purchase money lien. BBSSI argues that while the value of the loan was for $21.6 million, $17.5 million of that was used to purchase real property and should be treated as a purchase money lien. BBSSI's entire argument rests on the assumption that a portion of the loan was for the purchase of property. It argues that the trial court erred as a matter of law in determining BBSSI's mortgage lien subordinate to the mechanic's liens because the purchase money nature of the majority of the loan requires that it be granted priority over the competing mechanic's liens to the extent of the amount of the loan advanced for purchase money. To reach BBSSI's legal argument, we must first address the trial court's factual determination that the loan was a construction loan, and not a purchase money loan.

Missouri has legislatively defined the term construction loan. Pursuant to section 443.055.1(3),[2] a construction loan is a loan:

(a) Which is secured by a security instrument; and

(b) The proceeds of which, by agreement of the borrower and lender, are intended to be used for the construction, alteration, modification or addition of improvements to real property; and

2. All references to statutes are to RSMo 2000, unless otherwise specified.

(c) The proceeds of which are disbursed in whole or in part by means of future advances or future obligations. The term "construction loan" includes loan proceeds used for expenses reasonably related to the construction, alteration, modification or addition of improvements to real property including governmental fees, taxes, interest, attorneys' and accountants' fees, architects' fees, engineers' fees, utility charges, hook-up or tap-on fees, title insurance, surveys, rents, loan origination or servicing fees, and similar expenses[.]

■ BBSSI's contention that a portion of the loan was in fact a purchase loan fails because the trial court's finding that the Interim Loan was a construction loan is supported by substantial evidence. The trial court entered two separate judgments against BBSSI, one judgment for Altom and the other for Great River. Those factual determinations which are uniform in both judgments are as follows:

1. [BBSSI] made a future advance deed of trust and construction loan to [HIDC] dated October 15, 2007 and recorded October 16, 2007. . . . The loan says that it is a construction mortgage and contains language on the first page of the deed of trust "This is a construction mortgage under Section 400.9.334 RSMo." and the wording "to enable completion of a contemplated improvement, all as contemplated by said Section 443.055 RSMo." (Paragraph 6.13 of Interim Loan Agreement)

2. The date [BBSSI] recorded its deed of trust, it knew that employment of subcontractors by the general contractor was contemplated and that the mechanics and material providers who were to provide labor and materials might file mechanic's liens against the property if their bills were not paid.

3. BBSSI would not have made the loan without an agreement to build the improvements on the land.

4. It was in the interest of BBSSI that the improvements be made on the land secured by its deed of trust.

5. BBSSI entered into the "Interim Loan Disbursement Agreement" dated October 15, 2007, between First American Title Insurance Company, [HIDC], and [BBSSI] wherein BBSSI agreed that its loan would be used for construction purposes.

6. BBSSI actively participated in the transaction whereby the mechanic's lien claimants were induced to supply the material and perform the labor for the project being developed by [HIDC].

7. BBSSI sent their own inspectors, LM Consultants, to the project to monitor the progress of construction.

8. As a condition to financing the project, BBSSI insisted on the execution of an "Excavation Agreement" dated October 1, 2007, between [HIDC] and [Gage].

9. [BBSSI] and [HIDC] entered into an "Interim Loan Agreement" dated October 15, 2007 which called for the "assignment of contractual rights", including "construction agreements" . . . "regarding development" (Paragraph 1.3 of Interim Loan Agreement). By this loan, BBSSI agreed to make the interim loan to HIDC to provide financing for the "cost of initial infrastructure improvements" (Paragraph 2.1 of Interim Loan Agreement) and for "completion of the proposed infrastructure construction" (Paragraph 2.2 of Interim Loan Agreement). In this agreement HIDC represented that it had permits and government approval for the "construction of the improvements" on the property (Paragraph 6.5 of Interim Loan Agreement). HIDC represented that it

had a "Development Agreement" with the City of Hollister that was being assigned to BBSSI (Paragraphs 6.11 and 10.23 of Interim Loan Agreement). As part of this "Interim Loan Agreement", there is a provision for BBSSI to receive from LM Consultants, Inc. an "Agreement for Construction Evaluation and Monitoring Services" with BBSSI regarding "monthly on-site inspections of the construction of the Improvements on the Property" (Paragraph 10.20 of Interim Loan Agreement), which Justin Gage testified were provided to BBSSI. The Interim Loan Agreement provided that HIDC was to provide BBSSI with an "executed construction contract for the construction of the Improvements on the Property satisfactory with Lender" Improvements (Paragraph 10.21 of Interim Loan Agreement). The Interim Loan Agreement provided that BBSSI was to receive a "written opinion of counsel" before the closing date that the Interim Loan was a "construction loan" under RSMo. 443.055 (Paragraph 10.26 of Interim Loan Agreement). A condition precedent to the execution of the Interim Loan Agreement was the execution of a "Disbursement Agreement" between HIDC, BBSSI and the "disbursing agent" (Paragraph 11.4 of Interim Loan Agreement), which in this case was First American Title Insurance Company, and advances by the disbursing agent would be paid for "Project Costs", including "amounts due and owing for work and materials in connection with the construction of the Improvements" (Paragraph 11.5 of Interim Loan Agreement).

The trial court made a factual determination that the Interim Loan was a construction loan. In support of this conclusion, the trial court relied on Section 6.13 of the Interim Loan which reads, "Borrower represents and warrants that the Inter-im Loan constitutes a "construction loan" under Missouri's future advance statute and qualifies for the availability of the benefits of the future advance provisions contained in Missouri's future advance statute (R.S.MO. § 443.055)." The trial court correctly determined that under section 443.055.1(3) the Interim Loan was a construction loan because it was secured by a security instrument, the Deed of Trust, and the proceeds were intended to be used for construction of improvements to real property, specifically, the "cost of initial infrastructure improvements" and the "completion of the proposed infrastructure construction." Further, HIDC and BBSSI entered into the Disbursement Agreement, which allowed advances by the "disbursing agent" to be paid for "Project Costs" including "amounts due and owing for work and materials in connection with the construction of the Improvements."

Substantial evidence supports the trial court finding that the parties intended and agreed the Interim Loan was to be a construction loan. Thus, BBSSI's point contending that the trial court erred as a matter of law in the application of lien priorities for a purchase money lien must be denied because the trial court did not find that the loan was in fact a purchase money lien. Under section 429.050, a mechanic's lien for materials furnished "shall attach to the buildings, erections or improvements for which they were furnished or the work was done, in preference to any prior lien or encumbrance or mortgage upon the land upon which said buildings, erections, or improvements . . . have been erected[.]" Under section 429.060, a mechanic's lien "shall be preferred to all other encumbrances which may be attached to or upon such buildings, bridges or other improvements, or the ground, or either of them, subsequent to the commencement of such buildings or improvements." There-

fore, a properly filed mechanic's lien takes precedence over a construction loan. *Glenstone Block Co.*, 330 S.W.3d at 102. Point I is denied.

In its second point, BBSSI claims the trial court erred in finding that BBSSI waived its prime mortgage lien because Missouri law does not apply the concept of implied lien waiver to purchase money liens. Respondents disagree and point to cases allowing waiver of a purchase money lien. We do not need to address BBSSI's waiver argument because, as we found in Point I, substantial evidence supports the court finding that the loan was a construction loan and not a purchase money lien. Point II is denied.

BBSSI claims in its third point that the trial court erred in declaring that Great River was entitled to a mechanic's lien because the plans developed by Great River "are incapable of use to construct any improvements" and therefore fail to satisfy the statutory requirements for a valid mechanic's lien.

 Mechanic's lien law is purely a creature of statute and the law should be construed as favorably as its terms will permit in order to provide security to those mechanics and materialmen who furnish materials and labor when improving the property. *Coomes v. Slater Development Corp.*, 36 S.W.3d 412, 414–15 (Mo. App. W.D.2001). "[T]he party claiming a statutory lien bears the burden of proving compliance with essential elements of the lien statute at issue." *Space Planners Architects, Inc. v. Frontier Town–Missouri, Inc.*, 107 S.W.3d 398, 403 (Mo.App. S.D. 2003). Section 429.015 controls when an engineering company may assert a mechanic's lien and states in pertinent part:

1. Every ... registered professional engineer or corporation registered to practice professional engineering ... who does any landscape architectural, architectural, engineering or land surveying work upon or performs any landscape architectural, architectural, engineering or land surveying service directly connected with the erection or repair of any building or other improvement upon land under or by virtue of any contract with the owner or lessee thereof ... upon complying with the provisions of this chapter, shall have for such person's landscape architectural, architectural, engineering or land surveying work or service so done or performed, a lien upon the building or other improvements and upon the land belonging to the owner or lessee on which the building or improvements are situated[.]

The statute was amended in 1997, to add subsections 5 and 7, which state:

5. Any design professional or corporation authorized to have lien rights under subsection 1 of this section shall have a lien upon the building or other improvement and upon the land, whether or not actual construction of the planned work or improvement has commenced if:

(1) The owner or lessee thereof, or such owner's or lessee's agent or trustee, contracted for such professional services directly with the design professional or corporation asserting the lien; and

(2) The owner or lessee is the owner or lessee of such real property either at the time the contract is made or at the time the lien is filed

. . . .

7. In any civil action, the owner or lessee may assert defenses which include that the actual construction of the planned work or improvement has not been performed in compliance with the professional services contract, is impracticable or is economically infeasible.

BBSSI asserts subsection 7 as an affirmative defense to Great River's mechanic's lien. BBSSI claims that, because the plans were incomplete, construction could not be commenced based upon those plans. BBSSI further argues that "[u]nder the facts adduced at trial, actual construction of the planned work is impracticable and incapable of being performed under § 429.015.7." Finally, BBSSI notes that HIDC failed at obtaining financing for the project making "actual construction of the planned work ... economically infeasible[.]"

In construing statutes, a court gives the words used their ordinary meaning by considering the entire act, its purposes, and the general course of legislation in order to ascertain the intent of the legislature and avoid unjust, unreasonable, or oppressive results. *State ex rel. Killingsworth v. George*, 168 S.W.3d 621, 623 (Mo.App. E.D.2005). "[P]rovisions of a legislative act are not read in isolation but construed together and read in harmony with the entire act." *State, Missouri Dept. of Soc. Services, Div. of Aging v. Brookside Nursing Ctr., Inc.*, 50 S.W.3d 273, 276 (Mo. banc 2001). A legislative response to a judicial pronouncement provides reliable indicia of intent and purpose of lawmaking activity. *See Wilson v. Monsanto Co.*, 926 S.W.2d 48, 50 (Mo.App. E.D.1996) (when dealing with a statutory amendment in response to a judicial decision, the court examined pre-amendment decisions to interpret the legislative purpose and intent behind the amendment, ultimately concluding that plaintiff's interpretation was not in line with the statutory intent).

In 1992, the Missouri Supreme Court issued its opinion in *Brownstein v. Rhomberg–Haglin & Assoc., Inc.*, 824 S.W.2d 13 (Mo. banc 1992), which held that in order to obtain a lien under Chapter 429, a de-sign professional "must have provided in his professional capacity either labor or materials used for improving the land." *Id.* at 16. BBSSI states that *Brownstein* "is still good law and still applies." For a design professional to assert a valid lien against real estate, that professional must establish that its plans or services were "directly connected" with improvements to that real estate. *Id.* at 15–18. Great River instead argues that the legislature took affirmative action against *Brownstein* by amending the statute in 1997, which is a reliable indicia of intent and purpose of the lawmaking activity. The 1997 amendment added subsections 5 and 7. Great River argues that BBSSI's reliance on subsection 7 as an affirmative defense in this issue completely vitiates subsection 5, is not read in harmony with the entire statute, and results in an unjust and absurd interpretation.

When construing section 429.015.5 in relationship to section 429.015.7, the intent of subsection 7 is to prevent abuse of mechanic's liens when a designer's plans are so inadequate, substandard, or unreasonable that they prevent actual construction based upon those plans or are so defective as to make the project impracticable or economically infeasible. Such are not the facts of this case.

Great River's plans were only partially completed because Great River was no longer being paid for its services; however, those plans had been put into use for the development of the construction project. Mel Eakins, of Great River, testified:

[Counsel for BBSSI]: My question is, other than this single plan [a completed water plan] that you mentioned, and we'll get into that in a little more detail later, what services, professional engineering services or related services, did Great River Engineering

provide that actually did enhance the real estate at issue, A or B in Great River Exhibit 1?

[Eakins]: Well, as I mentioned before, almost exclusively with the exception of possibly this water line, everything was done to a partially completed level because the developer never finished the project, so I would say this, one, if this project was to continue you pick up where we left off with these partially complete plans and continue on from that point, and the second thing is that all the blasting we've been discussing over the last several days has been in accordance with, to my knowledge, these plans.

[Counsel for BBSSI]: Which plans?

[Eakins]: Water park plans, the road plans.

Eakins then discussed how the plans would benefit any third party who took over the project because they would be further along and could use the plans as a baseline for new construction. Eakins further testified:

[Counsel for BBSSI]: I believe you testified earlier that there was blasting done, I believe we were talking about area A on Exhibit 1, that you thought was done on the basis of your preliminary plans, is that right?

[Eakins]: That's correct.

[Counsel for BBSSI]: Do you know that they were done on the basis of your plans?

[Eakins]: Based on discussions that I've had with Mr. Gage and his staff and what I can visually see, I know the plans, I know the project, I can walk out there and look and see that it's done in accordance with our plans.

█ The credibility of witnesses and the weight given to their testimony is for the trial court, which is free to believe none,

part, or all of the testimony of any witness. *Apted–Hulling Inc. v. L & S Properties, Ltd.,* 234 S.W.3d 486, 489 (Mo.App. E.D. 2007). Substantial evidence supports a finding that the plans provided by Great River brought value to the land, and its plans were "directly connected" with improvements to that real estate. Point III is denied.

The trial court held that Altom and Great River both timely filed and perfected their mechanic's liens, the mechanic's liens contained just and true accounting of the work performed, that Altom has complied with all conditions precedent to the creation and enforcement of its mechanic's liens under section 429.010, and that Great River is entitled to mechanic's liens on the subject real property. In its fourth point, BBSSI asserts that Altom and Great River failed to provide "just and true accounts" under section 429.080 because neither submitted an itemized list of incurred expenses.

█ Section 429.080, RSMo Cum. Supp.2007, requires that a lien claimant file a "just and true account of the demand due" as a prerequisite to a mechanic's lien. "'The true purpose of [section 429.080] is to exact a substantial compliance with its requirements, and this is had whenever it appears that the account filed has not been knowingly, intentionally or fraudulently falsified.'" *Missouri Land Development Specialties, LLC v. Concord Excavating Co., LLC,* 269 S.W.3d 489, 498 (Mo.App. E.D.2008) (quoting *Banner Lumber Co. v. Robson,* 182 Mo.App. 611, 168 S.W. 244, 246 (Mo.App.St.L.D.1914)). "The question of adequacy of the subcontractor's lien statement thus turns upon whether the statement provides detail and itemization sufficient to enable the owner to investigate and determine the propriety of the lien claim." *Commercial Openings, Inc. v. Mathews,* 819 S.W.2d 347, 350 (Mo. banc

**156**

1991). Mechanic's lien statutes are remedial in nature and should be liberally construed. *Breckenridge Material Co. v. Byrnesville Const. Co., Inc.*, 842 S.W.2d 551, 552 (Mo.App. E.D.1992). "Although there is no precise definition of 'just and true,' whether a lien statement meets those requirements depends upon the facts of each particular case." *Dave Kolb Grading, Inc. v. Lieberman Corp.*, 837 S.W.2d 924, 933 (Mo.App. E.D.1992).

▮▮▮ A review of Respondents' lien statements shows that each statement contained itemized invoices detailing the type of work being done, the date the work was performed, the hours worked, the hourly rate for the individual, and the total amount owed. Altom provided the court with thirty-nine pages of detailed invoices containing the quantity, description, rate, and amount. Altom also provided the invoices from ECI, which serve as the basis for Altom's numbers and identify the cubic yardage of rock and materials blasted. No testimony of fraudulent charges was presented during trial. Justin Gage testified that he believed the numbers to be accurate. Additionally, BBSSI offered no evidence at trial outlining that they were unable to investigate or determine what work was done on the project and whether the amounts charged were proper. When reviewing the evidence and all reasonable inferences in the light most favorable to the verdict, there is substantial evidence that the Respondents' mechanic's lien statements did present a just and true accounting of the materials and work performed. Point IV is denied.

The judgment is affirmed.

BURRELL, P.J., and LYNCH, J., concur.