

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| BATES & ASSOCIATES, INC., | ) | Nos. ED106955/ED107279 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| v. | ) | 16SL-CC00187 |
| | ) | |
| PROVIDENCE BANK & VISION | ) | |
| VENTURES, LLC | ) | Honorable David L. Vincent, III |
| | ) | |
| Respondent. | ) | Filed: September 17, 2019 |

OPINION

In these consolidated appeals, Bates & Associates, Inc. ("Bates") appeals from the judgment of the trial court in its petition for breach of contract against Vision Ventures, LLC ("Vision") and for enforcement of its architect lien against Providence Bank ("Providence"). Bates asserts the trial court erred in denying its claim for lien enforcement against Providence because it was entitled to a lien under the statute even though actual construction of the planned work had not yet commenced, and because its lien was timely filed. We affirm.

Background and Procedure

The parties agree to the following. Bates is a licensed architectural firm, and Bates entered into a contract with Vision in October 2013 for architectural design and construction services related to a senior care facility ("the Project"). Prior to the contract between Bates and Vision, in 2007, the predecessor in interest to Vision entered into a commercial loan agreement

with Premier Bank to borrow funds of $2,480,000.00 ("the Loan"). The Loan was secured by a Deed of Trust, granted by Vision to Premier Bank, encumbering 17655 Wild Horse Creek Road, Chesterfield, Missouri ("the Property"). In 2008, Vision executed and delivered a promissory note to Premier Bank for an additional amount of $1,366,862.00 ("the Note"), secured by a modification to the Deed of Trust. Following the closure of Premier Bank, the Loan, the Deed of Trust, and the Note were assigned to Providence. In March 2015, Vision filed for Chapter 11 bankruptcy and listed Bates as an unsecured creditor with a claim in the amount of $279,200.00. Vision defaulted on the Loan and Note by failing to pay all amounts owed, and Providence elected to foreclose on the Deed of Trust to the Property. On July 15, 2015, Bates filed a mechanic's lien upon the Property for the work performed under the contract with Vision. On July 17, 2015, the non-judicial foreclosure took place, and Providence obtained title to the Property.

Bates filed a three-count Petition to enforce its mechanic's lien against Vision and Providence. In Counts I and III, it requested damages against Vision in the amount of $305,279.00, plus interest and attorneys' fees, under theories of breach of contract and quantum meruit, asserting Vision failed to pay the sums owed Bates for design services rendered pursuant to their contract; and in Count II, it requested a judgment declaring its mechanic's lien in the amount of $305,279.00 against the Property was superior to and had priority over Providence's interest, and an order enforcing the lien. Providence filed affirmative defenses, including that Bates failed to comply with the statutory requirements of Chapter 429, in that its mechanic's lien was not timely filed, and that no development work or improvement had occurred at the Property. Providence also filed, as relevant to this appeal, a counterclaim to quiet title to the Property and for a declaratory judgment that Bates had no right to or interest in the Property.

At a bench trial, Steven Warlick ("Warlick"), an architect from Bates, and Bo Hagerman ("Hagerman"), the director of design at Bates, testified to the following. Bates initially contracted with Vision in October 2013 to provide schematic designs, design development, construction documents, and construction administration for a senior care facility. After the initial design was approved by the City of Chesterfield, Vision requested so many design changes to reduce costs that Chesterfield withdrew its approval. In January 2015, Warlick had a meeting with Rodney Henry ("Henry") of Vision, during which they discussed providing additional work to comply with Chesterfield zoning requirements. Warlick sent Vision a proposal for these services and, although Henry did not sign the proposal, Warlick testified Henry agreed verbally. In accordance with their agreement, Bates performed additional architectural work for Vision in January through March of 2015, including reworking the design plans to regain approval from Chesterfield. Warlick agreed, however, that Bates's invoices to Vision did not reflect work performed past July 2014; that the July 2015 lien did not include documentation showing work was performed in 2015; and that Bates's internal timesheets between January and March 2015 documented only client communications and internal discussions about the proposal, rather than design work. In contrast to Bates's evidence, Providence submitted deposition testimony from Henry stating he did not request additional architectural services from Bates, and he did not provide approval for Bates to begin additional services because he had not vetted the proposed scope changes.

The trial court granted Bates's breach-of-contract claim against Vision in the amount of $276,250.00 and denied the alternative quantum-meruit claim against Vision. The trial court denied Bates's claim to enforce its mechanic lien against Providence, and granted Providence's counterclaim for quiet title to the Property. The trial court concluded Bates's architectural

services were not directly connected with any construction or other improvements upon the Property. Further, the trial court concluded Bates did not timely file its lien. This appeal follows.

Discussion

Bates raises two points on appeal. First, Bates argues the trial court erred in denying its claim to enforce the mechanic's lien because the services it performed under the contract were lienable. Second, Bates argues the trial court erred in denying its claim to enforce its mechanic's lien because the lien was timely filed, in that it provided services under the contract within six months before filing the lien on July 15, 2015. We disagree. Because the second point is dispositive, our analysis is limited to this point.

This Court reviews a bench-tried case for whether there is substantial evidence to support the judgment, it is against the weight of the evidence, or it erroneously applies the law. *Ivie v. Smith*, 439 S.W.3d 189, 198-99 (Mo. banc 2014). We defer to the trial court's findings of fact, so long as they are supported by substantial evidence. *Royal Forest Condominium Owners' Ass'n v. Kilgore*, 416 S.W.3d 370, 373 (Mo. App. E.D. 2013). However, because the interpretation and application of a contract is a question of law, we review such issues de novo, giving the words of the agreement their plain and ordinary meaning, so as to best ascertain the intent of the parties. *Shocklee v. Albers Chiropractic Health Centre, P.C.*, 558 S.W.3d 83, 86 (Mo. App. E.D. 2018); *McHugh v. Slomka*, 531 S.W.3d 588, 593 (Mo. App. E.D. 2017).

Section 429.015 provides that those persons or corporations who provide architectural work or services directly connected with the erection or repair of any building or other improvement upon land "under or by virtue of any contract with the owner or lessee thereof" shall, upon complying with the provisions of this chapter, have a lien upon the building or other

4

improvements and upon the land on which the building or improvements are situated, regardless of whether or not actual construction of the planned work or improvement has commenced. *See* Section 429.015.1, .5, RSMo. (cum. supp. 2011). However, any person seeking a lien under chapter 429 must file with the circuit court within six months after the indebtedness has accrued, a just and true account of the demand due that has given rise to the lien. *See* Section 429.080.

Providence and Vision assert that Bates is not entitled to a lien under chapter 429 because it did not file a just and true account of the demand due within six months after the indebtedness accrued. The term accrued has been construed to mean "when the indebtedness becomes complete; when the last labor is performed or the last material is furnished under an agreement." *United Petroleum Serv., Inc. v. Piatchek*, 218 S.W.3d 477, 481-82 (Mo. App. E.D. 2007) (citation omitted); *see also Brentwood Glass Co., v. Pal's Glass Serv., Inc.*, 499 S.W.3d 296, 303 (Mo. banc 2016).

The record here shows that the original 2013 contract between Bates and Vision agreed for Bates to provide design services, bid documents, construction documents, and construction administration services for a total price of $325,000.00. In Bates's final invoice to Vision in July 2014, Bates claimed it had performed design services and document development and had provided construction documents and construction administration services valued at $305,279.01.[1] According to the invoice, the last date that work was performed was July 7, 2014. Similarly, in its petition to enforce the lien, Bates again asserted the amount it was owed for work performed under the contract totaled $305,279.01. Based on the July 2014 invoice, the final indebtedness for the amount Bates claimed on the contract for the Project accrued July 7,

---

[1] Specifically, the July 7, 2014 invoice documented $81,250.00 for schematic designs, 100% completed; $65,000.00 for document development, 100% completed; $130,000.00 for construction documents, 100% completed; $23,725.00 for construction administration (including $16,250.00 in bidding/negotiations, 100% completed, and $7,475.00 for other construction administration, 23% completed); and $5,304.01 in reimbursable expenses.

2014, and the time to file the lien expired six months later on January 7, 2015.  Bates filed its lien on July 15, 2015.

Nevertheless, Bates argues that because it continued to perform work under the original 2013 contract between January and March of 2015, the indebtedness did not accrue until March 23, 2015, when the final work was performed, and the lien was not due until 6 months later, making its July 15, 2015 lien timely.  There is no dispute that the work Bates performed up and until July 7, 2014, was pursuant to the original 2013 contract.  The dispute here derives from work alleged to be performed between January and March of 2015.  Under Section 429.015.1, to be lienable, the work must be performed "under or by virtue of any contract with the owner or lessee thereof."  Thus, the question for this Court is whether the work performed in January through March of 2015 was pursuant to the original 2013 contract, or any supplemental contract, and thus lienable work under Section 429.015.  We find it was not.

First, we look to the substance of the work Bates performed between January and March of 2015 in order to determine if it was performed pursuant to the original contract, as Bates argues.  The record shows that employees of Bates met with Henry of Vision on January 16, 2015.  Following this meeting, Bates's timesheets showed internal meetings about the Project and that Bates's employees drafted correspondence to Henry.  On February 27, 2015, Bates sent Vision a proposed contract for additional services in the amount of $70,000.00.[2]  Warlick testified that, while Henry did not sign the amended contract, Henry verbally agreed to the amendment for additional services.  Warlick, however, was unable to recall when Henry

---

[2] Specifically, Bates proposed a contract of $5,000.00 for façade elevation changes at the request of the City of Chesterfield; $10,000.00 for owner scope changes to Memory Care; $7,200.00 for owner scope changes for Interior Design; $17,800.00 for owner scope changes related to square footage; and $30,000.00 for late payment fee for Vision's failure to pay under the original contract, for a total lump sum payment of $70,000.00.

6

purportedly agreed to the proposed agreement for additional services, or whether Henry verbally accepted the proposed agreement in person or over the telephone. Henry testified in his deposition that he did not approve the additional services. Our review of the correspondence between Warlick and Henry does not reflect an agreement between the parties that Bates should provide additional services; rather, the last provided email dated March 23, 2015, reflected a request by Henry for further information from Warlick. While Warlick sent Henry a revised proposal on March 23, 2015, that included additional details about which employees would be providing the services and their hourly rates, Henry did not sign the proposed agreement for additional services, and by this time, Vision had already filed for bankruptcy.

Bates argues the existence of an agreement for additional services was immaterial to the lien because the work its employees performed in preparing the proposal for additional services constituted labor performed under the original contract, in that it addressed developments to the Project. This assertion, however, is not supported by the language of the original contract itself, which states:

> § 4.3.1 Upon recognizing the need to perform the following Additional Services, the Architect shall notify the Owner with reasonable promptness and explain the facts and circumstances giving rise to the need. The Architect shall not proceed to provide the following services until the Architect receives the Owner's written authorization:
>
> > .1 Services necessitated by a change in the Initial Information, previous instructions or approval given by the Owner, or a material change in the Project, including, but not limited to, size, quality, complexity, the Owner's schedule or budget for Cost of the Work, or procurement or delivery method;
> > …
> >
> > .6 Preparation of design and documentation for alternate bid or proposal requests proposed by the Owner;
> > …
>
> [and]

7

§ 13.1 … This Agreement may be amended only by written instrument signed by both Owner and Architect.

While the original contract anticipates the possibility of additional services, its plain language creates a distinction between services included in the original contract and other services for which there must be a later, separate written agreement. Specifically, the language of the original contract states the architect may not proceed on additional services stemming from a material change in the Project, including changes to the size, quality, or complexity of the work, without written authorization. By identifying that these additional services require written authorization, the language demonstrates the contracting parties' intent that the additional services do not fall within the purview of the original contract. *See Patterson v. Rough Road Rescue, Inc.*, 529 S.W.3d 887, 893-94 (Mo. App. E.D. 2017) (cardinal principle of contract interpretation is to ascertain and give effect to intention of parties, looking to the whole document). Logically, if the additional services are explicitly excluded from the original contract, then the development of a proposal to provide these additional services is likewise not work under the original contract.

Here, the record demonstrates Bates's proposed additional changes involved changes to the size and quality of the Project, and thus Bates was required to obtain written authorization before it was permitted to perform its proposed design work. Because Bates could not perform the proposed additional design work without written authorization, it could not be considered within the scope of the original contract or necessary to complete the original contract. Likewise, the work Bates alleged it performed in January through March 2015 to develop[3] and

---

[3] We note that our review of the record shows some discrepancies in Bates's allegations that it drafted the proposal for additional services in January through March 2015. The record shows Bates had a meeting with the City of Chesterfield on August 19, 2014, during which Chesterfield informed Bates it would require a redesign of the Project. Following this meeting, Bates's timesheets show internal meetings about what to do next, culminating in the project

8

communicate its proposal for additional services was not necessary to complete the original contract, and it did not extend the time to file the lien, which expired on January 7, 2015. *See United Petroleum Serv.*, 218 S.W.3d at 482 (only work that is reasonably necessary to complete original contract operates to extend lien deadline); *see also In re Trilogy Dev. Co.*, 468 B.R. 854, 866 (Bkrtcy. W.D. Mo. 2011) (work that is not essential for completion of contract and was not part of work defined in parties' contract is not lienable) (citations omitted).

Section 429.015.1 requires that for work to be lienable, it must be performed "under or by virtue of [a] contract." The work here performed between January and March of 2015 did not fall under the purview of the original 2013 contract, nor does the record show that Bates and Vision entered into a written, signed or executed supplementary contract to perform additional work. Thus, the work Bates claimed it performed in January through March 2015 was not lienable work.

Second, not only did the proposal for additional services not fall within the purview of the original contract and thus not extend the filing deadline, but any work done in drafting the proposal for additional services did not constitute an improvement upon the land that would be lienable.[4] To be entitled to a lien, the professional must establish that the provided plans or services were "directly connected" with improvements to the real estate against which the lien is

---

manager drafting *in September 2014* a contract for additional services totaling $75,000.00. It appears from the timesheets that Bates did not have any meetings with Vision about the proposed contract for additional services until January 16, 2015. Although Warlick testified that at the January 2015 meeting, Henry requested Bates redesign the Project to regain approval from Chesterfield, Bates's own evidence supports Henry's deposition testimony that he did not request the redesign. Rather, it appears Bates drafted a contract for additional services before the meeting with Henry occurred. The work on the proposal for additional services performed in September 2014 occurred more than six months before Bates filed its lien in July 2015. However, even if Bates's employees drafted the proposal in January through March 2015 as they allege, because this work was not performed pursuant to the original contract, it did not serve to extend the lien-filing deadline, as discussed in the body of this Opinion.

[4] Again, our discussion here relates only to whether the work Bates performed in January through March of 2015 in developing the proposal for additional work was lienable work under the statutes. We do not discuss the issue of whether the work Bates performed up and until July 7, 2014, may be considered an improvement upon the land.

sought. *Altom Const. Co. v. BB Syndication Servs., Inc.*, 359 S.W.3d 146, 154-55 (Mo. App. S.D. 2012); *see also R.K. Matthews Inv., Inc. v. Beulah Mae Housing, LLC*, 379 S.W.3d 890, 900 (Mo. App. W.D. 2012) (purpose of mechanic's liens is to protect those who contribute labor or material to the improvement of the property by allowing them to look to the property for compensation) (citation omitted). Bates's work in developing a proposal for additional services did not itself create any redesign plans, completed or otherwise, that could run with and improve the land itself. *Cf. id.* (finding that even though engineering plans were only partially complete, because they had been partially implemented and could be used by any third party who took over the project, they added value to land and were directly connected with improvements to that real estate).[5]

Here, the proposal for additional services included substantial changes to the original design, in that it proposed removing kitchens from the second-floor apartments, creating a new set of finish-plan documents with alternative finishes, and performing a major redesign of the entire facility on each floor to reduce the overall square footage. The record, however, does not demonstrate Bates began work on the proposed redesign services; rather, the records document only "discussion" and "meetings" "regarding next steps" and "follow-up" about the additional services. While Bates cites to *Altom* for the proposition that an incomplete project is no bar to a lien where the architect stops work due to lack of payment, in *Altom*, there was evidence of partial plans that improved the land against which the lien was sought. These same facts were not before the trial court here. A proposal for a contract for additional services is not the same as

---

[5] We note here there was no testimony or evidence that a successor in interest to Vision would be able to use Bates's design plans, and thus there was no substantial evidence to support a claim that Bates's plans brought value to the land or were directly connected with improvements to the Property. *Cf. Altom Const. Co. v. BB Syndication Servs., Inc.*, 359 S.W.3d 146, 154-55 (Mo. App. S.D. 2012).

a partial or complete set of designs.  Bates failed to produce evidence it provided redesign plans or services that were "directly connected" with improvements to the Property here, and thus it was not entitled to a lien for this administrative work not pursuant to any existing contract.  The party seeking to enforce a lien has the burden of establishing compliance with essential elements of the applicable statutes, and Bates did not meet its burden here.  *See Winters Excavating, Inc. v. Wildwood Dev., L.L.C.*, 341 S.W.3d 785, 790 (Mo. App. S.D. 2011).

Because we find that Bates did not file its lien within the timeframe prescribed by the statute, no lien attaches, and it is neither necessary nor relevant to our disposition for this Court to consider Bates's remaining arguments.  Points I and II are denied.

<u>Conclusion</u>

The judgment of the trial court is affirmed.

_____
Robin Ransom, J.

James M. Dowd, P.J., and
Gary M. Gaertner, Jr., J., concur.

11